**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-1915**

MARIO SALINAS; WILLIAM ASCENCIO, Plaintiffs, on behalf of themselves and others similarly situated; BERNALDINO SALINAS; FRANKLIN HENRIQUEZ,

Plaintiffs - Appellants,

and

JOSE DOLORES MANCIA; OSMEL HERNANDEZ; HENRY GARCIA VIERA; HENRY GARCIA,

Plaintiffs,

v.

COMMERCIAL INTERIORS, INC.,

Defendant - Appellee,

and

J.I. GENERAL CONTRACTORS, INC.; JUAN FLORES RAMIREZ, personally; ISAIAS FLORES RAMIREZ, personally,

Defendants.

--------------------------------------------------

SECRETARY OF LABOR; NATIONAL EMPLOYMENT LAW PROJECT; LABORERS' INTERNATIONAL UNION OF NORTH

AMERICA MID-ATLANTIC REGIONAL ORGANIZING COALITION; CENTRO DE LOS DERECHOS DEL MIGRANTES,

Amici Supporting Appellant.

———————

Appeal from the United States District Court for the District of Maryland, at Greenbelt. J. Frederick Motz, Senior District Judge. (8:12-cv-01973-JFM)

———————

Argued: October 27, 2016                              Decided: January 25, 2017

———————

Before WYNN, FLOYD, and HARRIS, Circuit Judges.

———————

Reversed by published opinion. Judge Wynn wrote the opinion, in which Judge Floyd and Judge Harris joined.

———————

**ARGUED:** Sally Jean Dworak-Fisher, PUBLIC JUSTICE CENTER, Baltimore, Maryland, for Appellants. Michael J. Jack, LAW OFFICES OF MICHAEL J. JACK, Marriottsville, Maryland, for Appellee. Dean Romhilt, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Secretary of Labor. **ON BRIEF:** Darin M. Dalmat, Kathy L. Krieger, JAMES & HOFFMAN, P.C., Washington, D.C., for Appellants. M. Patricia Smith, Solicitor of Labor, Jennifer S. Brand, Associate Solicitor, Paul L. Frieden, Counsel for Appellate Litigation, Office of the Solicitor, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Secretary of Labor. Brian J. Petruska, LIUNA MID ATLANTIC REGIONAL ORGANIZING COALITION, Reston, Virginia; Catherine K. Ruckelshaus, NATIONAL EMPLOYMENT LAW PROJECT, INC., New York, New York, for Amici National Employment Law Project, Laborers' International Union of North America Mid-Atlantic Regional Organizing Coalition, and Centro De Los Derechos Del Migrantes.

———————

WYNN, Circuit Judge:

J.I. General Contractors, Inc. ("J.I."), a now-defunct framing and drywall installation subcontractor owned by brothers Juan and Isaias Flores Ramirez, directly employed Plaintiffs Mario Salinas, William Ascencio, Bernaldino Salinas, and Franklin Henriquez as drywall installers. During its existence, J.I.—and therefore Plaintiffs—worked almost exclusively for Commercial Interiors, Inc. ("Commercial"), a company offering general contracting and interior finishing services, including drywall installation, carpentry, framing, and hardware installation.

Plaintiffs sued J.I., the Ramirez brothers, and Commercial (collectively, "Defendants") for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq.; the Maryland Wage and Hour Law, Md. Code Ann., Lab. & Empl. §§ 3-401 et seq.; and the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. §§ 3-501 et seq. According to the complaint, Commercial and J.I. jointly employed Plaintiffs, (1) requiring aggregation of Plaintiffs' hours worked for Commercial and J.I. to assess compliance with the FLSA and Maryland law and (2) rendering Commercial and J.I. jointly and severally liable for any violations of the statutes.

The district court granted summary judgment to Commercial, holding that Commercial did not jointly employ Plaintiffs because J.I. and Commercial entered

3

into a "traditionally . . . recognized," legitimate contractor-subcontractor relationship and did not intend to avoid compliance with the FLSA or Maryland law. J.A. 1138–39.[1] But the legitimacy of a business relationship between putative joint employers and the putative joint employers' good faith are not dispositive of whether entities constitute joint employers for purposes of the FLSA. Rather, joint employment exists when (1) two or more persons or entities share, agree to allocate responsibility for, or otherwise codetermine—formally or informally, directly or indirectly—the essential terms and conditions of a worker's employment and (2) the two entities' combined influence over the essential terms and conditions of the worker's employment render the worker an employee as opposed to an independent contractor.

Applying this test, we conclude, based on the undisputed facts, that Commercial jointly employed Plaintiffs for purposes of the FLSA and the analogous Maryland law. Accordingly, we reverse.

I.

A.

J.I. directly employed Plaintiffs as drywall installers. Since 2009, J.I. contracted to provide labor for two companies: Commercial and a now-defunct

---

[1] Citations to "J.A. __" refer to the Joint Appendix filed by the parties in this appeal.

contractor known as P & P. Nearly all of J.I.'s work came through its contracts with Commercial. Notably, J.I. contracted to provide labor for P & P only when Commercial had no work available for J.I. to complete—which occurred twice, at most. Thus, as J.I. employees, Plaintiffs worked almost exclusively for Commercial during the course of their employment.

J.I. generally was responsible for hiring and firing Plaintiffs, though one Plaintiff testified that a Commercial foreman threatened him with termination due to work the Commercial foreman viewed as substandard. And on another occasion, when J.I. had difficulty enrolling in an insurance program mandated for a particular jobsite, Commercial required several Plaintiffs to complete applications for employment with Commercial and to work directly for Commercial on the project. Typically, J.I. paid Plaintiffs; however, on at least a few occasions, Plaintiffs received paychecks issued by Commercial.

Commercial also played a role in determining Plaintiffs' daily and weekly schedules. At each jobsite, the general contractor and others, including Commercial, decided upon the start and end times for work on the jobsite. In addition to regular hours on the site, Commercial foremen told certain Plaintiffs to work additional hours or to report to work on Sundays. Commercial also was involved in determining where Plaintiffs worked each day. Commercial's superintendent regularly communicated Commercial's site-specific staffing needs

5

to the Ramirez brothers, who assigned J.I.'s employees in accordance with Commercial's requests.

While working on Commercial's jobsites, Plaintiffs wore hardhats and vests bearing the Commercial logo. And Commercial foremen gave J.I. supervisors sweatshirts branded with Commercial's logo for those supervisors to wear while working on Commercial projects. In addition to these outward markers, Plaintiffs were instructed to tell anyone who asked that they worked for Commercial.

Upon reporting to the assigned jobsite each day, Commercial required Plaintiffs to sign in on timesheets provided by Commercial and bearing Commercial's logo. Commercial retained these timesheets, storing them in a temporary office typically located on each jobsite before sending them to Commercial's main office in Maryland for retention. Using these timesheets, Commercial foremen recorded the time Plaintiffs reported to work, as well as the time Plaintiffs finished working each day. By contrast, J.I. did not keep or maintain written records of Plaintiffs' hours.

After signing in for work on nearly every morning, Commercial required Plaintiffs to attend meetings. At these meetings, Commercial foremen gave instructions regarding the projects Plaintiffs needed to complete and the methods they needed to follow in doing so. Commercial also required Plaintiffs to attend a weekly safety meeting. Because Plaintiffs are native Spanish speakers and speak

6

limited English, J.I. supervisors generally translated the Commercial foremen's instructions to Plaintiffs.

Commercial foremen continually supervised Plaintiffs as they completed their assigned tasks. For example, when J.I. did not have a supervisor at a jobsite, Commercial foremen told Plaintiffs what to do and how to do it. And regardless of whether J.I. had a supervisor at a jobsite, Commercial foremen "check[ed]" Plaintiffs' work throughout each day to "[m]ak[e] sure that the work [wa]s quality." J.A. 78c. Commercial foremen also verified that J.I. employees' work was "acceptable" before Commercial issued payment to J.I. J.A. 81b. If Plaintiffs' work was not up to Commercial's standards or specifications and J.I. had a supervisor on site, Commercial communicated the deficiencies to Plaintiffs via J.I.'s onsite supervisors. Plaintiffs were then expected to remedy the identified shortcomings.

Commercial owned and provided nearly all the tools and materials Plaintiffs used to complete their tasks, even though Commercial's contract with J.I. provided that J.I. was obligated to provide all materials and equipment. In particular, Commercial supplied Plaintiffs with nail guns, chop saws, lasers, safety goggles, ropes, gloves, earplugs, and gangboxes (metal storage boxes) for overnight tool storage. Commercial also provided the materials Plaintiffs needed to complete their work, including metal studs used for framing and the drywall installed on

7

Commercial projects. By contrast, J.I. did not own or provide Plaintiffs with any equipment or materials, and Plaintiffs provided only small, handheld tools.

## B.

On July, 2, 2012, Plaintiffs filed a collective action under the FLSA, the Maryland Wage and Hour Law, and the Maryland Wage Payment and Collection Law against Defendants in the United States District Court for the District of Maryland.[2] The complaint alleged that Defendants willfully failed to pay Plaintiffs' wages, including overtime wages, in violation of the FLSA and Maryland law. Plaintiffs asserted that they were jointly employed by Commercial and J.I., rendering Commercial and J.I. jointly and severally liable for any violations of the FLSA or Maryland statutes.[3]

---

[2] Franklin Henriquez, Osmel Hernandez, Jose Mancia, Bernaldino Salinas, and Henry Viera—Mario Salinas's and William Ascencio's coworkers at J.I.—joined as plaintiffs soon thereafter. Osmel Hernandez and Jose Mancia accepted Rule 68 offers of judgment from J.I. and the Ramirez brothers and are not parties to this appeal. Henry Garcia also is no longer a plaintiff in this action. Therefore, only Mario Salinas, William Ascencio, Bernaldino Salinas, and Franklin Henriquez remain as Plaintiffs.

[3] On appeal, the parties address only whether Commercial was Plaintiffs' joint employer under the FLSA. Our resolution of the FLSA joint employment question also resolves Plaintiffs' claims under the Maryland Wage and Hour Law, which defines "employer" consistently with the FLSA. 29 U.S.C. § 203(d) (defining employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee"); Md. Code Ann., Lab. & Empl. § 3-401(b) (defining "employer" as including "a person who acts directly or indirectly in the interest of another employer with an employee"). We have interpreted these laws

(Continued)

8

Commercial moved for summary judgment, arguing that it did not jointly employ Plaintiffs. To determine whether Commercial and J.I. jointly employed Plaintiffs, the district court created and applied a novel multifactor test focusing on the legitimacy of the contracting relationship between Commercial and J.I. and whether the putative joint employers intended to evade federal and state wage and hour laws. In particular, the court's test examined the following five factors:

(1) Was the relationship between JI and Commercial one that traditionally has been recognized in the law?

(2) Was the amount paid by Commercial to JI pursuant to the contract between them sufficient to permit the direct employer to meet its legal obligations under the FLSA while earning a reasonable profit?

(3) Did the relationship between JI and Commercial appear to be a "cozy" one, i.e., one that is virtually exclusive and shaped by things other than objective market forces?

(4) Is the alleged violation of the FLSA one of which Commercial, during the ordinary course of performance of its own duties, should have been aware?

---

consistently in prior cases. *See McFeeley v. Jackson St. Entm't*, 825 F.3d 235, 240 (4th Cir. 2016) ("Because plaintiffs' claims under Maryland labor laws run parallel to their claims under the FLSA, our analysis of federal law extends as well to the state law claims."). Plaintiffs acknowledge that their claim under the Maryland Wage Payment and Collection Law "is now moot." Appellants' Opening Br. at 6. Accordingly, our decision does not address that claim.

(5)    Are there other indicia that the relationship between JI and Commercial was designed to abuse the employees of the direct employer?

J.A. 1138. Applying this test, the district court concluded that Commercial did not jointly employ Plaintiffs. Consequently, Plaintiffs (1) could not aggregate the hours they worked for J.I. and Commercial in determining compliance with the FLSA and Maryland law and (2) could not hold Commercial jointly and severally liable for the alleged wage and hour violations.

With Commercial dismissed from the suit, Plaintiffs' claims against J.I. and the Ramirez brothers proceeded to trial. After a three-day bench trial, the district court entered judgment in favor of Plaintiffs against J.I. and the Ramirez brothers, in the amount of $18,482.16. The district court later awarded Plaintiffs $7,850 in attorneys' fees and costs. J.I. and the Ramirez brothers satisfied the judgment in full.[4]

Plaintiffs now appeal the district court's conclusion that Commercial did not jointly employ Plaintiffs. On appeal, Plaintiffs assert that the district court's novel joint employment test (1) did not conform to the FLSA's definitions of "employ," "employee," and "employer"; (2) failed to adhere to the Department of Labor's longstanding regulations regarding joint employment; and (3) improperly limited

---

[4] In footnote 5, *infra*, we explain why this judgment does not render Plaintiffs' claims against Commercial moot.

joint employment liability to situations in which "a court finds evidence of subterfuge or indicia of abuse." Appellants' Opening Br. at 1–2. For the reasons given below, we agree with Plaintiffs' assertions.

## II.

## A.

Congress enacted the FLSA in 1938—in the midst of the Great Depression—to combat the pervasive "evils and dangers resulting from wages too low to buy the bare necessities of life and from long hours of work injurious to health." S. Rep. No. 75-884, at 4 (1937). Congress intended the FLSA "to free commerce from the interferences arising from production of goods under conditions that were detrimental to the health and well-being of workers," *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 727 (1947), and "to protect 'the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others.'" *Benshoff v. City of Va. Beach*, 180 F.3d 136, 140 (4th Cir. 1999) (quoting *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944), *superseded in part by statute*, 29 U.S.C. § 254(a) (1947)). To that end, the FLSA establishes a federal minimum wage and requires employers to pay "a rate not less than one and one-half times the regular rate" to employees who work more than forty hours in a single workweek. 29 U.S.C. §§ 206(a), 207(a)(1).

Consistent with the FLSA's "remedial and humanitarian" purpose, *Tenn. Coal*, 321 U.S. at 597, Congress adopted definitions of "employ," "employee," and "employer" that brought a broad swath of workers within the statute's protection. In particular, Congress defined "employ" as "to suffer or permit to work." 29 U.S.C. § 203(g). This definition derived from state child-labor laws, which imposed liability not only on businesses that directly employed children but also on "businesses that used middlemen to illegally hire and supervise children." *Antenor v. D & S Farms, Inc.*, 88 F.3d 925, 929 n.5 (11th Cir. 1996); *Rutherford Food*, 331 U.S. at 728 & n.7; *see also People ex rel. Price v. Sheffield Farms-Slawson-Decker Co.*, 121 N.E. 474, 476 (N.Y. 1918) (explaining that a New York child-labor law's definition of "employed" as "permitted or suffered to work" imposed liability "equally" on businesses that employed children directly and businesses that employed children indirectly through agents).

Likewise, Congress defined "employee" as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), describing this language as "the broadest definition that has ever been included in any one act." *United States v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945) (quoting 81 Cong. Rec. 7657 (1937) (statement of Sen. Hugo Black)); *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 300 n.21 (1985) (same). And Congress defined "employer" in a similarly expansive fashion, providing that an "employer" is "any person acting

12

*directly or indirectly* in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d) (emphasis added). The Supreme Court has explained that the "striking breadth" of these definitions brings within the FLSA's ambit workers "who might not qualify as [employees] under a strict application of traditional agency law principles" or under other federal statutes. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).

Although the FLSA does not expressly reference "joint employment," the Department of Labor's first set of regulations implementing the statute—which remain in force—recognize that "[a] single individual may stand in the relation of an employee to two or more employers at the same time under the Fair Labor Standards Act of 1938, since there is nothing in the act which prevents an individual employed by one employer from also entering into an employment relationship with a different employer." 29 C.F.R. § 791.2(a).

To that end, the regulations distinguish "separate and distinct employment" and "joint employment." *Id.* Separate employment exists when "all the relevant facts establish that two or more employers are acting *entirely independently* of each other and are *completely disassociated* with respect to the" individual's employment. *Id.* (emphasis added). Separate employers may "disregard all work performed by the employee for the other employer" when determining their obligations under the FLSA. *Id.* By contrast, joint employment exists when "the

13

facts establish ... that employment by one employer is *not completely disassociated* from employment by the other employer[]." *Id.* (emphasis added).

"[J]oint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act, including the overtime provisions, with respect to the entire employment for the particular workweek." *Id.* Accordingly, the hours an individual works for each joint employer in a single workweek must be aggregated to determine whether and to what extent the individual must be paid overtime to comply with the FLSA.[5] *See Chao v. A-One*

---

[5] The principle that joint employers are jointly and severally liable for complying with the FLSA, including its overtime provisions, serves as the basis for our rejection of Commercial's argument that Plaintiffs' claims are moot. Commercial asserts that Plaintiffs were awarded a judgment against J.I. and the Ramirez brothers; that this judgment was satisfied; and that, since Plaintiffs claimed that Defendants were jointly and severally liable for all violations, Plaintiffs recovered all of the relief available to them through that judgment. We reject Commercial's reasoning. Far from having "no remaining claims," Appellee's Response Br. at 21–22, Plaintiffs assert claims for relief that can be granted only if we reverse the district court's award of summary judgment and conclude that Commercial was Plaintiffs' joint employer. Namely, Plaintiffs seek payment of unpaid overtime wages from weeks in which they worked less than forty hours for J.I. and Commercial considered separately, but more than forty hours for J.I. and Commercial in the aggregate.

Plaintiffs have adduced sufficient evidence for us to conclude that, if we deem Commercial their joint employer, additional relief may be available. In particular, Plaintiffs point to documents showing at least one week in which each Plaintiff worked more than forty hours for Commercial and J.I. in the aggregate, but less than forty hours for each entity considered separately. These unpaid hours were not covered by Plaintiffs' judgment against J.I. and the Ramirez brothers, which reflected only unpaid overtime wages from weeks in which Plaintiffs

(Continued)

14

*Med. Servs., Inc.*, 346 F.3d 908, 916–18 (9th Cir. 2003) (aggregating an employee's hours for each joint employer to determine whether the joint employers complied with the FLSA overtime provision); *Karr v. Strong Detective Agency, Inc.*, 787 F.2d 1205, 1207–08 (7th Cir. 1986) (aggregating the hours worked for each joint employer separately to determine the total overtime pay owed). Therefore, the joint employment doctrine: (1) treats a worker's employment by joint employers as "one employment" for purposes of determining compliance with the FLSA's wage and hour requirements and (2) holds joint employers jointly and severally liable for any violations of the FLSA. *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 305, 307, 310 (4th Cir. 2006).

The Supreme Court has long recognized that two or more entities may constitute joint employers for purposes of the FLSA. For example, in *Rutherford Food*—which predated the Department of Labor regulations setting forth the circumstances in which joint employment generally exists—the Court observed that the plaintiff meat boners could be employed both by the subcontractor that

---

worked more than forty hours for J.I. alone. As instructed by *Cedar Coal Co. v. United Mine Workers of America*, 560 F.2d 1153 (4th Cir. 1977), we have considered the relevant documents only "[i]n ascertaining whether the case[ is] moot" and not "in ascertaining the merits." 560 F.2d at 1166. On remand, the district court is tasked with determining whether and to what extent Plaintiffs are entitled to damages for unpaid overtime wages associated with this evidence.

directly employed them and by a slaughterhouse operator who supervised and controlled their daily work. 331 U.S. at 724–25, 730; *see also Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 70 (2d Cir. 2003) ("*Rutherford* was a joint employment case, as it is apparent from the Supreme Court's opinion that the boners were, first and foremost, employed by the [independent contractor] who had entered into a contract with the slaughterhouse."). Likewise, in *Falk v. Brennan*, 414 U.S. 190 (1973), the Court found that maintenance workers who provided services to apartment complexes were employed both by the owners of the complexes and by the company that contracted to provide management services for the complexes because that company maintained "substantial control" over the conditions of the workers' employment. 414 U.S. at 195.

Following the Department of Labor's regulation and the Supreme Court's decisions recognizing the joint employment doctrine, Congress repeatedly has reaffirmed that the FLSA's definitions of "employ," "employee," and "employer" dictate that two or more entities can constitute "joint employers" for purposes of the FLSA. For example, in amending the FLSA in 1988, Congress recognized the "FLSA joint employment rule," explaining that "there are some situations in which an employee who works for two separate employers or in two separate jobs for the same employer has all of the hours worked credited to one employer for purposes of determining overtime liability." S. Rep. No. 99-159, at 12 (1985); H.R. Rep.

16

No. 99-331, at 23 (1985). Congress also endorsed the FLSA's joint employment doctrine in enacting the Migrant and Seasonal Agricultural Workers Protection Act, 29 U.S.C. §§ 1801 et seq. (the "Migrant Workers Act"), which uses the same definition of "employ" as the FLSA. 128 Cong. Rec. S11,749 (daily ed. Sept. 17, 1982) (adopting "[t]he exact same principles . . . to define the term 'employ' in [Migrant Workers Act] *joint employment* situations as are used under FLSA" (emphasis added)).

## B.

Notwithstanding the joint employment doctrine's venerable and entrenched position, courts have had difficulty developing a coherent test distinguishing "separate employment" from "joint employment." As explained below, courts' attempts to distinguish separate employment from joint employment have spawned numerous multifactor balancing tests, none of which has achieved consensus support.

The genesis of the confusion over the joint employment doctrine's application appears to be the Ninth Circuit's decision in *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983). Emphasizing that courts must consider "the circumstances of the whole activity" and that no set of factors was "etched in stone," the *Bonnette* Court concluded that four, nonexclusive factors "provide a useful framework" for determining whether an

17

entity constitutes a joint employer: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." 704 F.2d at 1469–70 (internal quotation marks omitted).

*Bonnette*'s four-factor joint employment test derived from the test the Ninth and Fifth Circuits used to distinguish employees from independent contractors for purposes of the FLSA. *Id.* (citing *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 756 (9th Cir. 1979); *Hodgson v. Griffin & Brand of McAllen, Inc.*, 471 F.2d 235, 237–38 (5th Cir. 1973)). These factors reflect the common-law test for determining whether an agency relationship exists, which focuses on the putative principal's "formal right to control the physical performance of another's work." *Zheng*, 355 F.3d at 69 (citing Restatement of Agency § 220(1) (1933) ("A servant is a person employed to perform service for another in his affairs and who, with respect to his physical conduct in the performance of the service, is subject to the other's control or right to control.")). A number of courts, including district courts in this Circuit, apply the *Bonnette* factors in determining whether two entities constitute joint employers for purposes of the FLSA. *See, e.g.*, *Gray v. Powers*, 673 F.3d 352, 355 (5th Cir. 2012); *Baystate Alt. Staffing, Inc. v. Herman*, 163 F.3d

18

668, 675–76 (1st Cir. 1998); *Dalton v. Omnicare, Inc.*, 138 F. Supp. 3d 709, 717 (N.D. W. Va. 2015).

Emphasizing that Congress intended for the FLSA to "stretch[] the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles," *Darden*, 503 U.S. at 326, several circuits have liberalized the *Bonnette* test, *see, e.g.*, *Zheng*, 355 F.3d at 69; *In re Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig.*, 683 F.3d 462, 468–70 (3d Cir. 2012). As the Second Circuit explained, "the four-factor test cannot be reconciled with the 'suffer or permit' language in the [FLSA], which necessarily reaches beyond traditional agency law." *Zheng*, 355 F.3d at 69. Accordingly, although satisfaction of the *Bonnette* factors "can be sufficient to establish employer status . . . a positive finding on those four factors is [not] necessary to establish an employment relationship." *Id.* (emphasis omitted).

Rather than developing an entirely new joint employment test, courts have elected to supplement the four *Bonnette* factors with additional factors intended to take into account the FLSA's more expansive definition of "employee." For example, *Zheng* identified six additional factors that speak to whether, as a matter of "economic reality," a putative employer "has functional control over workers even in the absence of . . . formal control." *Id.* at 72. The Eleventh Circuit applies an eight-factor test—with five factors that derive from regulations implementing

19

the Migrant Workers Act and speak to many of the considerations addressed by the *Bonnette* factors—designed to assess whether a worker is "economically dependent" on a putative joint employer.[6] *Layton v. DHL Express (USA), Inc.*, 686 F.3d 1172, 1176–77 (11th Cir. 2012). And although the Ninth Circuit has not expressly replaced the *Bonnette* test, it now assesses whether a joint employment relationship exists using thirteen nonexclusive factors, five from the text of the Migrant Workers Act regulations and eight derived from case law. *Torres-Lopez v. May*, 111 F.3d 633, 639–41 (9th Cir. 1997). "[L]ike other open-ended balancing tests," this universe of nebulous factor tests has "yield[ed] unpredictable and at times arbitrary results." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1392 (2014) (Scalia, J.).

---

[6] The Migrant Workers Act and the FLSA identically define "employ" as "to suffer or permit to work." 29 U.S.C. § 203(g); *id.* § 1802(5) (defining "employ" as having "the meaning given such term under section 3(g) of the Fair Labor Standards Act of 1938"). Moreover, the regulations promulgated pursuant to the Migrant Workers Act define joint employment under that Act as having the same scope as joint employment under the FLSA. 29 C.F.R. § 500.20(h)(5) ("The definition of the term employ includes the joint employment principles applicable under the Fair Labor Standards Act."); H.R. Rep. No. 97-885, at 6 (1982) (explaining that the Migrant Workers Act's adoption of the FLSA definition "was deliberate and done with the clear intent of adopting the 'joint employer' doctrine as a central foundation of this new statute"). Therefore, cases involving joint employment claims under the Migrant Workers Act are particularly relevant to an examination of joint employment under the FLSA. The "regulatory factors" often relied upon by courts in considering joint employment claims are located in 29 C.F.R. § 500.20(h)(5)(iv).

We agree that *Bonnette*'s reliance on common-law agency principles does not square with Congress's intent that the FLSA's definition of "employee" encompass a broader swath of workers than would constitute employees at common law. *See Darden*, 503 U.S. at 326. Accordingly, courts should not rely on the *Bonnette* factors in determining whether a worker constitutes *an employee or independent contractor* for purposes of the FLSA and analogous labor statutes.[7] But focusing on *Bonnette*'s errant reliance on common-law agency principles diverts attention from two more fundamental problems with the use of the *Bonnette* factors—and tests built upon those factors—in the joint employment context: that the factors (1) improperly focus on the relationship between the employee and putative joint employer, rather than on the relationship between the putative joint employers, and (2) incorrectly frame the joint employment inquiry as a question of an employee's "economic dependence" on a putative joint employer.

As to the first problem, recall that the joint employment doctrine addresses whether a relationship exists between two entities such that they should be treated as a single employer for purposes of determining compliance with and liability under the FLSA. To that end, the Department of Labor regulations state that joint

---

[7] This Court follows the six-factor test set forth in *United States v. Silk*, 331 U.S. 704 (1947), *abrogated in part by* 503 U.S. 318 (1992), to determine whether a worker is an independent contractor or employee for purposes of the FLSA. *See infra* Part IV.B.

employment exists when employment by *one employer* is "not completely disassociated from employment by the *other employer*[]." 29 C.F.R. § 791.2(a) (emphasis added). Likewise, we have held that the joint employment inquiry must address the "relationship between *the employer* who uses and benefits from the services of workers and *the party that hires or assigns the workers to that employer*." *Schultz*, 466 F.3d at 306 (emphasis added) (internal quotation mark omitted) (quoting *Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 193 (S.D.N.Y. 2003)).

Tests focusing on the relationship between a worker and a putative joint employer—like the *Bonnette* test—do not address, much less solve, the problem of whether two entities are "entirely independent" or "not completely disassociated" with regard to the essential terms and conditions that govern a worker's employment, 29 C.F.R. § 791.2(a), and thus whether the worker's employment with the two entities should be treated as "one employment" for purposes of determining compliance with the FLSA, *Schultz*, 466 F.3d at 307. In particular, regardless of whether two entities qualify as employers under the *Bonnette* factors, courts still must determine whether those two entities are "not completely disassociated," 29 C.F.R. § 791.2(a), with regard to the terms of a worker's employment, such that "all of [the] hours worked [should be] credited [as if] to one employer for purposes of determining overtime liability," S. Rep. No. 99-159, at

22

12. Likewise, even if two entities do not independently constitute employers under the *Bonnette* test, their combined influence over the terms and conditions of a worker's employment may give rise to liability under the FLSA if the entities are "not completely disassociated" with regard to the worker's employment. *See Schultz*, 466 F.3d at 305 ("The district court therefore erred by weighing the degree of control exercised by [one putative joint employer] against that exercised by [the other]. The court should have instead weighed the agents' control against the total control exercised by [both joint employers]."). In other words, *Bonnette* and its progeny do not squarely address the "joint" element of the "joint employer" doctrine.

The second problem with the *Bonnette* factors and related tests—their focus on whether "as a matter of economic reality, the individual is dependent" on a putative joint employer, *Layton*, 686 F.3d at 1175—also reflects a failure to distinguish the joint employment inquiry from the separate, employee-independent contractor inquiry. Courts' focus on economic dependency derives from the Supreme Court's decisions in *Rutherford Food* and *Goldberg v. Whitaker House Cooperative, Inc.*, 366 U.S. 28, 33 (1961). *See, e.g.*, *Torres-Lopez*, 111 F.3d at 639–40; *Antenor*, 88 F.3d at 932; *Bonnette*, 704 F.2d at 1469. Yet neither case supports the use of economic dependence to guide the entire joint employment analysis.

23

In *Rutherford Food*, the Supreme Court considered whether Kaiser, a slaughterhouse operator, employed meat boners who were directly employed by an independent contractor that provided labor for Kaiser's meat deboning process. 331 U.S. at 724–25. The meat boners "did a specialty job on [Kaiser's] production line," working in one room within the slaughterhouse to remove the bones from cattle carcasses as they were conveyed into the room by Kaiser employees on an overhead rail running throughout the slaughterhouse. *Id.* at 726, 730. In performing their tasks, the meat boners used Kaiser's premises and equipment and were supervised by one of Kaiser's "managing official[s]." *Id.* at 730. These factors, among others, reflected that "the circumstances of the whole activity" compelled the conclusion that the "meat boners were employees of" Kaiser for purposes of the FLSA. *Id.*

Although *Rutherford Food* recognized joint employment—that both Kaiser and the independent contractor employed the meat boners—the case principally addressed whether the meat boners were employees or independent contractors of Kaiser, not whether Kaiser and its independent contractors were joint employers. *See id.* at 727–28 ("We pass only upon the question whether the boners were employees of [Kaiser] under the Fair Labor Standards Act."). Indeed, before the case reached the Supreme Court, the Tenth Circuit characterized "[t]he strongly contested issue [as] whether the boners were and are employees of Kaiser, within

24

purview of the Act, or were and are independent contractors." *Walling v. Rutherford Food Corp.*, 156 F.2d 513, 516 (10th Cir. 1946), *aff'd*, 331 U.S. 722 (1947). Therefore, *Rutherford Food* embraced economic dependency as a vehicle for distinguishing employees from independent contractors—not for determining whether two entities jointly employ a putative employee for purposes of the FLSA.

*Goldberg* likewise applied the "economic dependence" test to distinguish between employees and independent contractors and not as the basis for finding joint employment. There, the Court considered whether members of a cooperative that made and sold "knitted, crocheted, and embroidered goods of all kinds" were also the cooperative's employees. 366 U.S. at 28–29. The Court concluded that the members, who made goods for the cooperative, were neither "self-employed" nor "independent," but rather were "employees" based on the "economic reality" test. *Id.* at 32–33. *Goldberg* did not address joint employment and relied heavily on *United States v. Silk*, 331 U.S. 704 (1947)—the foundational case addressing how to distinguish employees from independent contractors for purposes of the FLSA. *Id.* at 33.

Although economic dependency is the prism through which courts should distinguish employees from independent contractors, as *Rutherford Food* and *Goldberg* demonstrate, it does not capture key ways in which putative joint employers may be "not completely disassociated" with respect to establishing the

25

terms and conditions of a worker's employment—the relevant question in determining whether entities constitute joint employers. 29 C.F.R. § 791.2(a). For example, in determining whether entities are joint employers, courts have considered whether workers perform a "specialty job on the production line," *Torres-Lopez*, 111 F.3d at 640; work on a putative joint employer's premises, *id.*, or perform a job "integral" to a putative employer's business, *Antenor*, 88 F.3d at 932; and whether the putative joint employer prepares payroll, *id.*, or maintains possession or control over the workers' employment records, *Enterprise Rent-A-Car*, 683 F.3d at 471. We agree that these considerations are relevant to the joint employment analysis in that they speak to whether putative joint employers are "not completely disassociated" with respect to the terms and conditions of a worker's employment, but we also recognize that these facts do not render a worker economically dependent on a putative joint employer.

Courts' conflation of economic dependency with whether two entities are "not completely disassociated" with respect to a worker's employment arises from their improper focus on the relationship between a putative joint employer and a worker, rather than the relationship between putative joint employers. If a court addresses whether one entity is a worker's "employer" under the FLSA, then it makes sense to examine economic dependency. After all, that focus is derived from cases that seek to answer the same question framed in reverse: whether an

26

individual is an entity's "employee." But such a focus is inapposite to the joint employment inquiry, which requires courts to determine whether the putative joint employers are not wholly disassociated or, put differently, share or codetermine the essential terms and conditions of a worker's employment.

In sum, courts have failed to develop a coherent test for determining whether entities constitute joint employers. The myriad existing tests—most of which derive from *Bonnette*—improperly (1) rely on common-law agency principles; (2) focus on the relationship between a putative joint employer and a worker, rather than the relationship between putative joint employers; and (3) view joint employment as a question of economic dependency. Accordingly, district courts should not follow *Bonnette* and its progeny in determining whether two or more persons or entities constitute joint employers for purposes of the FLSA.

## C.

In *Schultz*, this Court established a two-step framework for analyzing FLSA joint employment claims, under which courts must first determine whether two entities should be treated as joint employers and then analyze whether the worker constitutes an employee or independent contractor of the combined entity, if they are joint employers, or each entity, if they are separate employers.[8] 466 F.3d at

---

[8] We recognize that deeming two or more persons or entities "joint employers" after determining that the first step of the joint employer framework is
(Continued)

305–07. Regarding the first step, *Schultz* identified the Department of Labor regulations as the starting point for determining whether two or more entities constitute joint employers for purposes of the FLSA and focused on the nature of the relationship between putative joint employers. *Id.* at 306; *see also Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005) (holding that if a statute is silent or ambiguous as to a particular issue, courts must "defer . . . to the agency's interpretation so long as the construction is a reasonable policy choice for the agency to make" (internal quotation marks omitted)).

But unlike many of our Sister Circuits, we have not identified specific factors courts should consider in determining whether a joint employment

satisfied—in other words, that the persons or entities codetermine the essential terms and conditions of a worker's employment—seems to put the cart before the horse by suggesting that the persons or entities are "employers" before we determine whether the worker at issue is an "employee" within the meaning of the FLSA. Accordingly, we reiterate that joint employment exists when both (1) two or more persons or entities share, agree to allocate responsibility for, or otherwise codetermine the essential terms and conditions of a worker's employment and (2) the worker is an "employee" within the meaning of the FLSA.

However, we continue to refer to persons or entities that codetermine the key terms and conditions of a worker's employment as "joint employers" (even before analyzing whether the worker is an employee) for two reasons. First, the Department of Labor's regulation suggests that "joint employer" is the appropriate term for a person or entity that satisfies the first step of our framework by being "not completely disassociated" with respect to the worker's employment. 29 C.F.R. § 791.2(a). And second, "joint employer" is a term of art commonly used by courts to refer to persons or entities that codetermine the essential terms and conditions of a worker's employment.

28

relationship exists, prompting our district courts to apply a variety of multifactor tests. *See, e.g.*, *Dalton*, 138 F. Supp. 3d at 717 (applying the four-factor *Bonnette* test); *Jennings v. Rapid Response Delivery, Inc.*, Civil No. WDQ-11-0092, 2011 WL 2470483, at \*3–4 (D. Md. June 16, 2011) (applying a nine-factor test derived from *Bonnette* and *Zheng*); *Heath v. Perdue Farms, Inc.*, 87 F. Supp. 2d 452, 457 n.4 (D. Md. 2000) (applying a nine-factor test derived from the Migrant Workers Act regulations and case law).[9]

In light of this confusion—and our admonition that courts should no longer employ *Bonnette* or tests derived from *Bonnette* in the FLSA joint employment context—we now set forth our own test for determining whether two persons or entities constitute joint employers for purposes of the FLSA. In doing so, we are guided by the Supreme Court's direction that the FLSA "must not be interpreted or applied in a narrow, grudging manner." *Tenn. Coal*, 321 U.S. at 597. Rather, "because the Act is remedial and humanitarian in purpose, it should be broadly interpreted and applied to effectuate its goals." *Benshoff*, 180 F.3d at 140 (internal quotation marks and citation omitted).

---

[9] Notably, the trial judge in this case applied a different joint employment test from that applied in another recent case. *See Hall v. DIRECTV, LLC*, Civil Nos. JFM-14-2355, JFM-14-3261, 2015 WL 4064692, at \*2 (D. Md. June 30, 2015).

As we made clear in *Schultz*, any joint employment inquiry must begin with the Department of Labor's regulations, which distinguish between "separate" employment—when two persons or entities are "entirely independent" with respect to a worker's employment—and "joint" employment—when the two persons or entities are "not completely disassociated." 29 C.F.R. § 791.2(a). To that end, the regulations identify three nonexclusive scenarios in which joint employment, as opposed to separate employment, generally exists:

> (1)  Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or
>
> (2)  Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
>
> (3)  Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

*Id.* § 791.2(b) (footnotes omitted). Each of these scenarios focuses on the relationship between the putative joint employers—the proper focus of the first step of the joint employment inquiry, which turns on the relative association or disassociation between entities with respect to establishing the essential terms and conditions of a worker's employment.

30

Although the regulations identify three distinct scenarios, all three speak to one fundamental question: whether two or more persons or entities are "not completely disassociated" with respect to a worker such that the persons or entities share, agree to allocate responsibility for, or otherwise codetermine—formally or informally, directly or indirectly—the essential terms and conditions of the worker's employment. *Cf. Enterprise Rent-A-Car*, 683 F.3d at 468 ("[W]here two or more employers . . . share or co-determine those matters governing essential terms and conditions of employment—they constitute 'joint employers' under the FLSA." (internal quotation marks omitted)).

In answering this question courts should consider six factors:

(1)   Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to direct, control, or supervise the worker, whether by direct or indirect means;

(2)   Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to— directly or indirectly—hire or fire the worker or modify the terms or conditions of the worker's employment;

(3)   The degree of permanency and duration of the relationship between the putative joint employers;

(4)   Whether, through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer;

31

(5)     Whether the work is performed on a premises owned or controlled by one or more of the putative joint employers, independently or in connection with one another; and

(6)     Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibility over functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work.

We emphasize that these six factors do not constitute an exhaustive list of all potentially relevant considerations.  To the extent that facts not captured by these factors speak to the fundamental threshold question that must be resolved in every joint employment case—whether a purported joint employer shares or codetermines the essential terms and conditions of a worker's employment—courts must consider those facts as well.

We also emphasize that "[t]he ultimate determination of joint employment must be based upon the circumstances of the whole activity."  *Schultz*, 466 F.3d at 306 (internal quotation marks omitted); 29 C.F.R. § 791.2(a) ("A determination of whether the employment by the employers is to be considered joint employment or separate and distinct employment for purposes of the act depends upon all the facts in the particular case.").    As Judge Easterbrook explained in *Reyes v. Remington Hybrid Seed Co.*, 495 F.3d 403 (7th Cir. 2007), "[a] score of 5 to 3 decides a baseball game," not whether two entities constitute joint employers under the relevant totality-of-the-circumstances test, 495 F.3d at 407.  And, the Department

32

of Labor regulation's focus on whether two entities are "*entirely* independent" or "not *completely* disassociated," 29 C.F.R. § 791.2(a) (emphasis added), indicates that one factor alone can serve as the basis for finding that two or more persons or entities are "not completely disassociated" with respect to a worker's employment if the facts supporting that factor demonstrate that the person or entity has a substantial role in determining the essential terms and conditions of a worker's employment.[10]

D.

We adopt the test set forth above for several reasons. First, the test focuses on the relevant relationship—the relationship between the putative joint employers—as dictated by the Department of Labor regulation and the purpose of the joint employment doctrine. 29 C.F.R. § 791.2(a). Focusing on whether putative joint employers share or codetermine the terms and conditions of a worker's employment also prevents courts from conflating the two separate

---

[10] We reiterate that the joint employment inquiry is a highly factual analysis. Accordingly, while one factor supported by significant facts pointing to two or more entities' codetermination of the key terms and conditions of a worker's employment may be sufficient to establish that the entities are joint employers, another factor with weaker factual support may not be. For example, a general contractor that sets the start and end times for all work on a jobsite or establishes site-wide safety protocols may not be a joint employer absent additional evidence of the general contractor's codetermination of the essential terms and conditions of the workers' employment.

inquiries within the joint employment analysis: (1) whether two or more entities are "not completely disassociated" with respect to a worker's employment and (2) in the context of the worker's entire employment, whether the worker is an employee protected by the FLSA or an independent contractor outside the statute's scope. That courts must apply different factors in determining whether entities are joint employers and whether workers are employees or independent contractors, and must weigh those factors through different lenses—whether the putative joint employers are "not completely disassociated" with regard to establishing the essential terms of a worker's employment versus whether workers are economically dependent on a putative employer—further serves to differentiate the two inquiries.

By focusing on the relationship between putative joint employers, our test also captures situations that tests focusing solely on the relationship between a worker and a putative joint employer cannot resolve. For instance, a finding that two entities independently constitute a worker's employers for purposes of the FLSA does not resolve whether the entities amount to *joint* employers such that the worker's hours for both employers must be aggregated to determine compliance with the statute. Likewise, two entities that do not individually employ a worker within the meaning of the FLSA may still have to comply with the FLSA if their combined influence over the essential terms and conditions of the worker's

34

activities gives rise to an employer-employee relationship. Our test provides clarity in such situations, whereas tests focusing solely on the relationship between a worker and each putative joint employer, like *Bonnette*, fail to address—much less resolve—the entities' joint obligations.

Finally, the test set forth above is appropriately different from—and more inclusive than—joint employment tests applied under other statutes that do not define "employ," "employer," and "employee" as broadly as the FLSA. The Supreme Court has contrasted the "striking breadth" of the FLSA's definition of "employee" with other statutes that define the term more narrowly, stating that an entity may constitute an employer for purposes of the FLSA even if it is not an employer under other statutes. *Darden*, 503 U.S. at 326.

We highlighted the implications of this difference in the context of joint employment in *Butler v. Drive Automotive Industries of America, Inc.*, 793 F.3d 404 (4th Cir. 2015). There, we dealt with whether two entities were joint employers for the purposes of Title VII of the Civil Rights Act of 1964. 793 F.3d at 408. We adopted a nine-factor "hybrid test" for determining when joint employment exists for Title VII purposes, deeming "the common-law element of control . . . the 'principal guidepost' in the analysis." *Id.* at 414. In adopting this test, we noted that "FLSA cases . . . are not particularly transferrable to Title VII cases" because the FLSA defines "employee" more broadly than Title VII and a

35

number of other federal labor statutes. *Id.* at 412 n.10. By rejecting the common-law "control" tests—like *Butler* and *Bonnette*—and instead focusing on whether two entities are "not completely disassociated" with regard to their codetermination of the key terms and conditions of a worker's employment, the test set forth above remains true to Congress's intent to define employment more expansively in the FLSA than in other statutes.

E.

In reaffirming *Schultz*'s two-step analysis and setting forth factors to aid in determining whether two or more entities are "not completely disassociated" with respect to a worker's employment, we also reject the novel test developed and applied by the district court, which focused on whether the relationship between putative joint employers was (1) "traditionally . . . recognized in the law," (2) represented a reasonable business decision, or (3) reflected a bad faith effort to avoid compliance with wage and hour laws. J.A. 1138–39.

That the general contractor-subcontractor relationship—or any other relationship—has long been "recognized in the law" and remains prevalent in the relevant industry has no bearing on whether entities codetermine the essential terms and conditions of a worker's employment and, therefore, constitute joint employers for purposes of the FLSA. As the Second Circuit has noted, "the prevalence of an industry-wide custom is subject to conflicting inferences. While,

36

on the one hand, it may be 'unlikely' that a prevalent action is 'a mere subterfuge to avoid complying with labor laws,' on the other hand, the very prevalence of a custom may 'be attributable to widespread evasion of labor laws.'" *Barfield v. N.Y.C. Health and Hosps. Corp.*, 537 F.3d 132, 146 (2d Cir. 2008) (quoting *Zheng*, 355 F.3d at 73–74).

More significantly, classifying contractors and subcontractors that share, allocate responsibility for, or codetermine the essential terms and conditions of a worker's employment as joint employers and requiring them to comply with the FLSA's wage and hour requirements does not undermine the many reasons the law has "traditionally" recognized the general contractor-subcontractor relationship. In particular, to the extent a subcontractor constitutes a bona fide independent contractor, the general contractor will limit its liability for the subcontractor's negligence. *Rowley v. Mayor & City Council of Balt.*, 505 A.2d 494, 496–97 (Md. 1986) ("The general rule is that the employer of an independent contractor is not liable for the negligence of the contractor or his employees."); Restatement (Second) of Torts § 409 (1965). And by entering into a general contractor-subcontractor relationship, the general contractor may not have to comply with tax, labor, and benefits laws that have narrower definitions of "employ," "employee," and "employer" than the FLSA. *See Darden*, 503 U.S. at 322–27. Accordingly, contrary to Commercial's protestations, applying the joint employment doctrine in

accordance with the intent of Congress and the Department of Labor does not undermine—let alone deal a fatal blow to—the "traditional" benefits of general contractor-subcontractor relationships; it simply ensures that "the wages paid by private employers are sufficient to maintain the bare cost of living."[11] H.R. Rep. No. 75-2182, at 6 (1938).

The fact that contracting out employment services represents a "reasonable business decision" likewise has no bearing on whether two entities constitute joint employers and therefore must jointly comply with the FLSA's wage and hour provisions. In numerous circumstances, courts have deemed an arrangement between two entities joint employment for purposes of the FLSA, notwithstanding the entities' reasonable business purpose for entering into the arrangement. For example, in *Barfield*, the Second Circuit acknowledged that a hospital contracted with referral agencies for temporary nursing services as a result of a "legitimate business concern" stemming from the shortage of health care workers available for full-time employment. 537 F.3d at 146. Nonetheless, the court held that the hospital jointly employed a nursing assistant who was directly employed and paid by three referral agencies with which the hospital contracted. *Id.* at 145–48.

---

[11] Again, we emphasize that certain elements of "traditional" general contractor control over workers on a jobsite may not be enough alone to trigger a finding that the general contractor jointly employs every worker on the site. *See supra* n.10.

Likewise, in *Schultz*, we concluded that a Saudi diplomat and an independent security services contractor jointly employed plaintiff security agents for purposes of the FLSA, notwithstanding that the contracting relationship made "business" sense because of licensing requirements for security businesses. 466 F.3d at 300–01.

Finally, that two persons or entities did not enter into a relationship with the intent to avoid compliance with the FLSA is not dispositive as to whether the persons or entities codetermine the key terms and conditions of a worker's employment or whether, ultimately, they are joint employers. To be sure, the joint employment doctrine serves to "preserve[] . . . [FLSA] protection so as to prevent such abuses as manipulation of job scheduling or rotation of workers to circumvent overtime requirements." H. Rep. No. 99-331, at 23–25. Accordingly, facts demonstrating that two entities jointly engaged in a bad faith effort to evade compliance with the FLSA—such as by strategically allocating levers of control over a worker so that neither entity independently constitutes the worker's employer—will provide strong evidence that the entities are "not completely disassociated" with respect to that worker's employment.

But as the Third Circuit has recognized in the context of the National Labor Relations Act—a labor statute that defines employment more narrowly than the FLSA—joint employment also can exist when "one employer while contracting in

*good faith* with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." *N.L.R.B. v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1123 (3d Cir. 1982) (emphasis added). For this reason, we join other courts in rejecting joint employment tests, like the one developed and applied by the district court in this case, that turn on whether an arrangement between putative joint employers was "purposely structured to avoid FLSA obligations." *Barfield*, 537 F.3d at 146–47 (holding that an entity can constitute a "joint employer even absent a showing of subterfuge or business bad faith").

## III.

## A.

We now apply the joint employment test set forth above to determine whether summary judgment was properly granted in favor of Commercial's position that it did not jointly employ Plaintiffs. We review a district court's award of summary judgment *de novo*, *Morrison v. Cty. of Fairfax*, 826 F.3d 758, 765 (4th Cir. 2016), viewing all facts in the light most favorable to the nonmovant, *Monahan v. Cty. of Chesterfield*, 95 F.3d 1263, 1265 (4th Cir. 1996). A court may award summary judgment only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

40

We also review *de novo* whether an entity is a joint employer for purposes of the FLSA. *Moreau v. Air France*, 356 F.3d 942, 945 (9th Cir. 2004); *cf. Schultz*, 466 F.3d at 304 ("[W]hether a worker is an employee or independent contractor under the FLSA presents a legal question that we review de novo."). In this case, we conclude that any factual disputes are immaterial and, therefore, resolve the joint employment question based on the undisputed facts in the record.

Applying the joint employment test set forth above, we conclude that Commercial and J.I. jointly employed Plaintiffs based on the following undisputed facts:

- Plaintiffs performed nearly all of their work on Commercial jobsites and for Commercial's benefit;

- Commercial provided the tools, materials, and equipment necessary for Plaintiffs' work, with Plaintiffs providing only small, handheld tools;

- On at least one occasion, Commercial rented a house near the jobsite for J.I. employees to stay in during a project;

- Commercial actively supervised Plaintiffs' work on a daily basis by having foremen walk the jobsite and check Plaintiffs' progress;

- Commercial required Plaintiffs to attend frequent meetings regarding their assigned tasks and safety protocols;

- Commercial required Plaintiffs to sign in and out with Commercial foremen upon reporting to and leaving the jobsite each day;

- Commercial foremen frequently directed Plaintiffs to redo deficient work, communicating problems to J.I. supervisors who translated the information to Plaintiffs;

41

- Commercial foremen told certain Plaintiffs to work additional hours or additional days;

- Commercial communicated its staffing needs to J.I., and J.I. based Plaintiffs' jobsite assignments on Commercial's needs;

- When J.I. performed certain "time and materials" work for Commercial and was paid on an hourly, rather than lump-sum, basis, Commercial told J.I. how many of its employees to send to the project and how many hours those employees were permitted to work;

- Commercial provided Plaintiffs with stickers bearing the Commercial logo to wear on their hardhats and vests bearing Commercial logos to don while working on Commercial jobsites;

- J.I. supervisors instructed Plaintiffs to tell anyone who asked that they worked for Commercial;

- Commercial provided J.I. supervisors with Commercial-branded sweatshirts to wear while working on Commercial projects;

- On at least one occasion, Commercial required J.I. employees to apply for employment with Commercial and directly hired those employees.

Although a majority of factors are not necessary to support a finding that two or more entities are "not completely disassociated" with respect to a worker's employment, *see supra* Part III.C., based on these facts, nearly all of the factors we identified above support such a finding.[12]

---

[12] We note that, under these undisputed facts, Commercial would amount to Plaintiffs' joint employer under the four-factor *Bonnette* test, which we held no longer applies in FLSA cases. *See supra* Part II.B. Thus, though the framework we announce today supplants other formulations of the FLSA joint employment test and makes clear that tests derived from principles of common-law control are

(Continued)

42

Regarding the first factor—supervision—Commercial and J.I. jointly directed, supervised, and controlled Plaintiffs. In particular, Commercial continuously supervised Plaintiffs, providing feedback and direction—both formally, through frequent mandatory meetings, and informally, through one-on-one instruction—regarding the methods and quality of Plaintiffs' work and compliance with safety protocols. Commercial also could—and did—require Plaintiffs to redo work Commercial found deficient. J.I. supervisors assisted in this supervision by translating Commercial's instructions and providing additional direction to Plaintiffs. Not only did Commercial supervise Plaintiffs' work, it also required Plaintiffs to hold themselves out as Commercial employees by providing Plaintiffs and J.I. supervisors with Commercial-branded clothing and safety equipment to wear on Commercial jobsites.

The second factor—authority over terms and conditions of employment—also supports a finding that Commercial and J.I. were "not completely disassociated" with respect to Plaintiffs' employment. Although J.I. generally was responsible for hiring and firing its employees, Commercial, in consultation with

---

insufficient to capture all employment situations that come within the auspices of the FLSA, there will be cases—like this one—in which it produces the same result as those formulations. Put differently, control is a sufficient condition—but not a necessary condition—for an entity to constitute a joint employer for purposes of the FLSA.

others, dictated Plaintiffs' hours and, at times, required Plaintiffs to work additional hours or on additional days. And when J.I. performed work for Commercial paid on an hourly, as opposed to lump-sum, basis, Commercial instructed J.I. regarding how it should staff the project and when it could pay overtime. Additionally, in at least one instance, Commercial directly hired at least one Plaintiff due to J.I.'s inability to enroll in an insurance program required for its employees to continue working on Commercial's jobsites.

Regarding the third and fourth factors, although Commercial did not own J.I., Commercial and J.I. had a longstanding business relationship. The overwhelming majority of J.I.'s contracts were with Commercial, and Plaintiffs worked almost exclusively on Commercial jobsites. Even after J.I. went out of business, Commercial continued its business relationship with the Ramirez brothers, who formed a new business, F.R. General Contractors, Inc., that has contracted with Commercial to provide drywall and framing services.

That Plaintiffs worked on premises controlled by Commercial speaks to the fifth factor—whether Plaintiffs worked in a location controlled by one or more of the putative joint employers. Indeed, Commercial required Plaintiffs to sign in and out of the jobsite with Commercial foremen and supervised Plaintiffs' actions while they were on the jobsite.

44

The final factor—codetermination or allocation of responsibility over functions ordinarily carried out by employers—also supports a finding that Commercial and J.I. were "not completely disassociated" with respect to Plaintiffs' employment. In particular, Commercial supplied Plaintiffs with all the tools, materials, and equipment necessary to perform their work. Moreover, on one occasion, Commercial provided a house for J.I. employees to live in while working on a Commercial jobsite. And while J.I. issued Plaintiffs' paychecks, Commercial recorded Plaintiffs' hours on timesheets, maintained those timesheets, and required Plaintiffs to sign in and out each day.

B.

Nevertheless, Commercial maintains that it did not jointly employ Plaintiffs for four reasons. First, it asserts that "Commercial and JI had nothing more or less than the contractor-subcontractor relationship which is normal and standard in the construction industry." Appellee's Response Br. at 13, 53. But, as explained above, that Commercial and J.I. engaged in a "traditional," "normal," or "standard" business relationship has no bearing on whether they jointly employ a worker for purposes of the FLSA. *See supra* Part III.E.

Second, Commercial emphasizes that its practice of having foremen supervise Plaintiffs' work and, through J.I. supervisors, demand corrections as needed amounted to "quality control" and therefore was not indicative of joint

45

employment. Appellee's Response Br. at 29, 50. We agree that an entity does not become a joint employer by engaging in the oversight necessary to ensure that a contractor's services meet contractual standards of quality and timeliness. *See Moreau*, 356 F.3d at 951 (finding that "indirect supervision or control . . . to ensure compliance with various safety and security regulations" was not indicative of joint employment when done "to verify that the task was done properly"); *Zheng*, 355 F.3d at 74–75 (finding that although "extensive supervision of a plaintiff's work is indicative of an employment relationship," "supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry").

But in this case, Commercial's supervision of Plaintiffs went beyond "double-check[ing] to verify that the task was done properly." *Moreau*, 356 F.3d at 951. Rather, Commercial foremen engaged in daily oversight of Plaintiffs' work and provided regular feedback and instruction, through J.I. supervisors, to Plaintiffs regarding the pace and quality of their work. In addition, Commercial foremen conducted frequent meetings to instruct Plaintiffs regarding the projects they needed to complete and the methods by which they should do so, as well as the safety protocols they should follow. Taken together, these facts amount to "extensive supervision . . . indicative of an employment relationship," rather than an assessment of compliance with contractual quality and timeliness standards.

46

*Zheng*, 355 F.3d at 74; *see also Torres-Lopez*, 111 F.3d at 642 (finding that the putative joint employer's "daily presence" on the jobsite and ability to "inspect all the work performed . . . both while it was being done and after" its completion weighed in favor of finding joint employment).

Contrary to Commercial's protestations, we also give little weight to the fact that Commercial's foremen generally spoke only to J.I.'s supervisors and did not speak to Plaintiffs directly. The FLSA provides that indirect control is sufficient to render an entity an "employer" under the statute. 29 U.S.C. § 203(d) (defining "employer" as "any person acting directly *or indirectly* in the interest of an employer in relation to an employee" (emphasis added)). The regulations implementing the FLSA also expressly contemplate that direct *or indirect* supervision and control is probative of joint employment, stating that joint employment will generally exist when employers "share control of the employee, directly *or indirectly*." 29 C.F.R. § 791.2(b)(3) (emphasis added).

To that end, courts have concluded that "the 'suffer or permit to work' standard was developed to assign responsibility to businesses that did *not* directly supervise putative employees." *Antenor*, 88 F.3d at 933 (emphasis added); *see also Torres-Lopez*, 111 F.3d at 642–43 (concluding that "indirect control as well as direct control can demonstrate a joint employment relationship"). Accordingly, "[i]t is well-settled that supervision is present whether orders are communicated

directly to the laborer or indirectly through the contractor." *Aimable v. Long & Scott Farms*, 20 F.3d 434, 441 (11th Cir. 1994); *see also Hodgson*, 471 F.2d at 238 ("The fact that [the putative joint employer] effect[s] the supervision by speaking to the crew leaders, who in turn sp[eak] to the [workers], rather than speaking directly to the [workers] does not negate a degree of apparent on-the-job control over the [workers]."). Here, Commercial supervised Plaintiffs by communicating instructions, on a daily basis, to Plaintiffs through J.I. supervisors. Commercial's use of J.I. supervisors to convey instructions to Plaintiffs, therefore, supports, rather than precludes, a finding that Commercial jointly employed Plaintiffs.

Third, Commercial emphasizes that its relationship with J.I. was that of a principal and an independent contractor, with J.I. receiving a "fixed price" or "lump sum" for supplying labor to Commercial. Appellee's Response Br. at 45. Although the FLSA does not define employee "so broadly that all or almost all employees of independent contractors . . . become 'employees' of every firm whose premises they enter," *Reyes*, 495 F.3d at 406, neither does the FLSA automatically exempt entities that use independent contractors to provide labor from complying with the statute's wage and hour provisions. Significantly, "independent contractor status does not necessarily imply the contractor is solely responsible for his employees under the [FLSA]. Another employer may be jointly responsible for the contractor's employees." *Hodgson*, 471 F.2d at 237. Here,

48

Commercial and J.I. codetermined the key terms and conditions of Plaintiffs' employment and therefore constituted joint employers, regardless of whether J.I. is properly characterized and treated as Commercial's independent contractor for other purposes.

Finally, Commercial maintains that a ruling in Plaintiffs' favor will render every general contractor a joint employer of its subcontractor's employees and thereby impose unreasonable financial burdens on general contractors. We disagree. As an initial matter, we reiterate that courts must assess joint employment "based upon the circumstances of the whole activity." *Schultz*, 466 F.3d at 306 (internal quotation marks omitted). Accordingly, were we confronted with different facts establishing that a general contractor possessed—and exercised—less pervasive authority to determine the essential terms and conditions of employment of a subcontractor's workers, our conclusion as to whether the entities were "not completely disassociated" may have been different. Additionally, we note that, given the FLSA's particularly expansive definition of "employee," a finding that a general contractor constitutes a joint employer for purposes of the FLSA does not necessarily mean the general contractor is a joint employer for purposes of other federal and state laws. *See supra* Part III.D.

Regarding the implications of our holding on the continued financial viability of the general contractor-subcontractor relationship, we commend the

Seventh Circuit's astute observation in *Reyes* that "[i]f everyone abides by the law, treating a firm . . . as a joint employer will not increase its costs." 495 F.3d at 409. Put differently, when—as here—a general contractor contracts work out to a subcontractor that directly employs workers, the general contractor will face no FLSA liability so long as it either (1) disassociates itself from the subcontractor with regard to the key terms and conditions of the workers' employment or (2) ensures that the contractor "cover[s] the workers' legal entitlements" under the FLSA. *Id.* Only when the general contractor "hires a fly-by-night operator . . . or one who plans to spurn the FLSA" is the entity "exposed to the risk of liability on top of the amount it has agreed to pay the contractor. And there are ways to avoid this risk: either deal only with other substantial businesses or hold back enough on the contract to ensure that workers have been paid in full." *Id.*

\* \* \* \* \*

In sum, the undisputed facts establish that Commercial and J.I. shared authority over and codetermined the key terms and conditions of Plaintiffs' employment, rendering Commercial Plaintiffs' joint employer.

### B.

Having concluded that Commercial and J.I. were "not completely disassociated" with respect to Plaintiffs' employment, we next must consider whether, based on their "one employment" with Commercial and J.I., Plaintiffs

50

were employees or independent contractors. *Schultz*, 466 F.3d at 305, 307. As we explained above—and unlike with the threshold codetermination inquiry—"[i]n determining whether a worker is an employee covered by the FLSA, a court considers the 'economic realities' of the relationship *between the worker and the putative employer*" or employers, in the event the worker is jointly employed. *Id.* at 304 (emphasis added). "The focal point is whether the worker 'is economically dependent on the business to which he renders service or is, as a matter of economic [reality], in business for himself." *Id.* (alteration in original) (quoting *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 570 (10th Cir. 1994)); *see also Bartels v. Birmingham*, 332 U.S. 126, 130 (1947) ("[I]n the application of social legislation employees are those who as a matter of economic reality are dependent upon the business to which they render service.").

When a worker is economically dependent on a putative employer—or, in the event two or more entities codetermine the essential terms and conditions of the worker's employment, his putative joint employers—he qualifies as an employee protected by the FLSA. By contrast, a worker whose profit or loss depends upon his own creativity, ingenuity, and skill is an independent contractor outside of the FLSA's scope. *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947) ("The definition 'suffer or permit to work' was obviously not intended to stamp all

51

persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another.").

We consider six factors in determining whether a worker constitutes an employee or independent contractor: "(1) the degree of control that the putative employer has over the manner in which the work is performed; (2) the worker's opportunities for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business." *Schultz*, 466 F.3d at 304–05. These factors—which derive from the Supreme Court's opinion in *United States v. Silk*— are "designed to capture the economic realities of the relationship between the worker and the putative employer." *Schultz*, 466 F.3d at 305.

Here, the district court found—and the parties do not dispute—that Plaintiffs were J.I.'s employees. Because Plaintiffs were economically dependent on J.I. alone, they were necessarily economically dependent on Commercial and J.I. in the aggregate. Indeed, were we to analyze the *Silk* factors from the perspective of Plaintiffs' "one employment" with Commercial and J.I., *Schultz*, 466 F.3d at 307, several factors would weigh even more heavily in favor of deeming Plaintiffs "employees" within the meaning of the FLSA. For example, with regard to the

first factor, due to Commercial's daily supervision of Plaintiffs, Commercial and J.I.—as Plaintiffs' "one employer"—exercised greater control over Plaintiffs' work than J.I. exercised alone. Likewise, given that Commercial, rather than J.I., provided all of the materials, supplies, tools, and equipment that Plaintiffs used for their work, the third factor weighs more heavily in favor of employment when viewed from the proper perspective of Plaintiffs' "one employment" with Commercial and J.I. Accordingly, we conclude that Plaintiffs were employees based on their entire employment for both J.I. and Commercial, and that J.I. and Commercial jointly employed Plaintiffs for purposes of the FLSA.

IV.

In sum, the district court errantly applied its novel five-factor test to determine whether Commercial jointly employed Plaintiffs. Under the proper test, joint employment exists when (1) two or more persons or entities share, agree to allocate responsibility for, or otherwise codetermine—formally or informally, directly or indirectly—the essential terms and conditions of a worker's employment and (2) the two or more persons' or entities' combined influence over the terms and conditions of the worker's employment render the worker an employee as opposed to an independent contractor. Applying this test, we find that Commercial and J.I. jointly employed Plaintiffs for purposes of the FLSA.

Therefore, we reverse the district court's award of summary judgment in favor of Commercial and remand for further proceedings.

*REVERSED*