In the

# United States Court of Appeals
## For the Seventh Circuit

———

No. 05-1628

DANIEL REYES, *et al.*,

*Plaintiffs-Appellants,*

*v.*

REMINGTON HYBRID SEED COMPANY, INC., *et al.*,

*Defendants-Appellees.*

———

Appeal from the United States District Court
for the Central District of Illinois.
No. 02-CV-2239—**Michael P. McCuskey**, *Chief Judge.*

———

ARGUED SEPTEMBER 26, 2005—DECIDED JULY 20, 2007

———

Before EASTERBROOK, *Chief Judge*, and RIPPLE and
ROVNER, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Braulio Zarate, Jr., re-
cruited members of the Reyes and Garcia families to
detassel and rogue corn plants in fields under the con-
trol of Remington Hybrid Seed Company. Hybrids can be
grown only if the plant's tassel is removed so that it may
be fertilized by a different variety. Detasseling must be
done several times per season, and though machines have
been developed for this task Remington prefers hand
detasseling when that is feasible. Removing unwanted
plants (rogueing) to improve the average quality of a plot
also is best done by hand. Zarate told the Reyeses and

Garcias that they could expect to work between six and eight weeks in Remington's fields (for between 72 and 84 hours a week), followed by work in Remington's plant sheds; he promised free housing in Indiana during that time. The families accepted the offer and traveled from Texas to Indiana.

Zarate furnished only dilapidated and overcrowded housing, however, and about 20 hours' work per week for five weeks. He did not fully compensate everyone for even that limited time and failed to make appropriate payments to the Social Security system for their work. Disappointed, the Reyeses and Garcias (collectively the workers) filed this suit under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-19, and the Migrant and Seasonal Agricultural Workers Protection Act (AWPA), 29 U.S.C. §§ 1801-72. Zarate defaulted; a judgment against him for more than $100,000 has been entered. But the workers never expected to collect much from Zarate. Their main target is Remington, which they call a joint employer with Zarate. The district court, however, concluded that Zarate was the workers' only employer. Summary judgment was entered in favor of Remington and its two senior managers, who the workers propose to hold derivatively liable under 29 U.S.C. §§ 203(d), 216(b). To simplify the exposition we disregard the managers and discuss only the claims against Remington.

Remington hired Zarate to provide detasseling and rogueing services; he engaged and paid the workers. The agreement between Remington and Zarate is a standard form for creating an independent-contractor relation. Zarate had no business independent of his work for Remington and apparently lacked liquid assets. Remington advanced the money that Zarate needed to secure workers' compensation insurance, and several times during the season Remington advanced funds so that Zarate could pay his crew. Zarate did not supply any tools; even the portable

toilets came from Remington. Although the workers do not contend that these facts spoil the independent-contractor classification as a matter of Indiana law, they may be significant as a matter of federal law, for reasons we discuss later. The workers' principal contention is that it just doesn't matter whether Zarate was an independent contractor, because under the FLSA the term "'[e]mploy' includes to suffer or permit to work." 29 U.S.C. §203(g). Remington permitted Zarate's crew to work on its crops and that, plaintiffs maintain, is that. The AWPA uses the FLSA's definition of "employ," see 29 U.S.C. §1802(5), so victory on this issue under either statute carries over to the other.

Before any of the workers arrived in Indiana, however, and thus before the statutory definition could come into play, they had dealings with Zarate in Texas. Plaintiffs maintain that Remington should be liable for Zarate's failure to supply 70 hours' work weekly for six to eight weeks and to provide decent housing. This argument can't rest on §203(g) unless it creates liability that runs backward in time, and there is no reason to read it in that fashion. Whether Remington is bound by Zarate's promises is wholly a matter of state law (whether of Indiana or Texas is a subject the parties do not discuss). This is so even if Zarate was Remington's agent. The FLSA doesn't guarantee minimum hours; it provides only a floor under the hourly rate of pay for hours actually worked. The AWPA likewise is silent about guarantees of work. Thus the workers' claim rests on common law. Zarate's contract with Remington establishes that he lacked actual authority to promise on Remington's behalf that the workers would receive either housing or any fixed quantity of work. So did he have apparent authority to bind Remington? The district judge thought not, observing that apparent authority depends on a manifestation by the principal and cannot be created by an agent's own words. See *Restatement (Third) of Agency* §2.03 & comment c (2006).

Plaintiffs do not contend that the AWPA displaces these common-law norms. It does oblige recruiters to disclose in writing a list of things, including the hourly wage and whether the workers will receive fringe benefits such as housing, 29 U.S.C. §1821(a), but does not provide that a recruiter may impose liability on the principal by making unauthorized promises; a misbehaving agent is on his own. Remington did not do or say anything that would have led the workers to believe that Zarate could make binding commitments on its behalf with respect to housing or hours of work; until arriving in Indiana they relied entirely on Zarate's unilateral statements. An agent doubtless has implied authority to make those ancillary arrangements that are normal for implementing the task at hand. See *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000). Yet plaintiffs do not assert that free housing was necessary (Remington itself thought not; its contract denies Zarate any power to make that promise) or that a guaranteed number of hours is essential or even common in recruiting agricultural workers. The AWPA requires disclosure of the hourly wage but not a minimum quantity of work. So Remington's liability depends on what it did (or permitted) after the workers arrived at fields under its control.

Although plaintiffs invite us to read §203(g) so broadly that all or almost all employees of independent contractors would become "employees" of every firm whose premises they enter, the Supreme Court has not taken such a perspective. True, it has read the statute broadly. See *Roland Electrical Co. v. Walling*, 326 U.S. 657 (1946); cf. *United States v. Silk*, 331 U.S. 704, 712 (1947) (Social Security Act). But instead of holding that employees of independent contractors *automatically* become joint employees of the firms for which these independent contractors supply labor, the Court has held that further inquiry is essential. See *Rutherford Food Corp. v.*

*McComb*, 331 U.S. 722 (1947); see also *Secretary of Labor v. Lauritzen*, 835 F.2d 1529 (7th Cir. 1987). One reason for this is 29 U.S.C. §203(r), which defines the "enterprise" subject to the Act's obligations in a way that excludes "the related activities performed for such enterprise by an independent contractor." See *Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290 (1985).

What, then, distinguishes the situations covered by §203(g) from those excluded by §203(r)? The Secretary of Labor has promulgated a regulation providing, among other things, that "[i]n determining if the farm labor contractor or worker is an employee or an independent contractor, the ultimate question is the economic reality of the relationship—whether there is economic dependence upon the agricultural employer/association or farm labor contractor, as appropriate." 29 C.F.R. §500.20(h)(4).

A reference to "economic reality" tells the court to disregard economic fantasy but does not say which aspects of "reality" have what legal consequences. " '[R]eality' encompasses millions of facts, and unless we have a legal rule with which to sift the material from the immaterial, we might as well examine these facts through a kaleidoscope." *Lauritzen*, 835 F.2d at 1539 (concurring opinion). The reference to "economic dependence" is scarcely more helpful. Thousands of employers compete for the services of agricultural workers; when deciding whether to accept Zarate's offer rather than someone else's, these workers were not "dependent" on Remington. Once they arrived in Indiana they were "dependent" in the sense that they relied on Zarate (and perhaps on Remington) to fulfil the deal (as both the travel and the work precede payment). They had sunk costs that may have led them to accept substandard housing and toilet facilities rather than endure transitional unemployment during a search for other work. This difference between the *ex ante* and *ex post* situations is true of all labor, however; how can it help us

to determine whether to disregard a given independent contractor?

The regulation lists eight considerations such as "[w]hether the agricultural employer/association has the power, either alone or through control of the farm labor contractor to direct, control, or supervise the worker(s) or the work performed (such control may be either direct or indirect, taking into account the nature of the work performed and a reasonable degree of contract performance oversight and coordination with third parties)". 29 C.F.R. §500.20(h)(5)(iv)(A). Another of the factors is "the degree of permanency and duration of the relationship at issue". *Id.* at (iv)(C).

The district court turned to these factors, concluded that three favor the workers and five favor Remington, and granted judgment for Remington. A score of 5 to 3 decides a baseball game, but this regulation does not work that way. It declares: "The factors set forth in paragraphs (h)(5)(iv)(A) through (G) of this section are illustrative only and are not intended to be exhaustive; other factors may be significant and, if so, should be considered, depending upon the specific circumstances of the relationship among the parties. How the factors are weighed depends upon all of the facts and circumstances." 29 C.F.R. §500.20(h)(5)(iv). What makes other factors "significant"? The regulation does not say. How are "all of the facts and circumstances" to be reconciled when they conflict, as they always do? The regulation does not say.

This is understandable in light of the regulation's goal, which appears to be offering a means to understand the extent to which the main employer's operation, and those of the purported independent contractor, are under "common control," which will defeat independent-contractor status. These factors are drawn from judicial opinions, including *Rutherford Food* and *Lauritzen* (conveniently

cited in the regulation) and repeated without evaluation or preference. Such a regulation does nothing more than provide a frame of reference, reducing counsel's need to conduct research without resolving any concrete dispute. This regulation cannot be violated; as it lacks a rule that one may contravene, it also lacks a rule that one may follow. It offers a way to think about the subject and not an algorithm. That's why toting up a score is not enough.

Let us go back to the statute, which says that " '[e]mploy' includes to suffer or permit to work." This is "the broadest definition . . . ever included in any one act." *United States v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945), quoting from Sen. Hugo Black, the Act's sponsor, 81 Cong. Rec. 7657 (1937). See also *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318, 326 (1992) (the FLSA "stretches the meaning of 'employee' to cover some parties who might not qualify as such under . . . traditional agency law principles.").

*Rutherford Food* goes into more depth about this language than any other decision of the Supreme Court before or since. Kaiser Packing operated a slaughterhouse. The de-boning operation was conducted by an experienced boner and a crew in his employ. Boning was conducted in one room of the plant; meat arrived at the boning operation on an overhead rail. Kaiser paid Reed, the boner, by the weight of the meat processed by his crew; Reed then decided how much to pay the workers. (Apparently members of the crew shared equally in these proceeds, without regard to hours worked.) Reed did not keep time records to show whether each worker received the minimum wage plus any required premium pay for overtime. The Court held that Kaiser no less than Reed was the crew's employer, because (a) the operation was conducted on Kaiser's premises; (b) boning was integral to the meat-packing plant, which the Court viewed as one economic

unit; and (c) Reed did not have any other business. The opinion sums up (331 U.S. at 730):

> the workers did a specialty job on the production line. . . . The premises and equipment of Kaiser were used for the work. The group had no business organization that could or did shift as a unit from one slaughterhouse to another. The managing official of the plant kept close touch on the operation. While profits to the boners depended upon the efficiency of their work, it was more like piecework than an enterprise that actually depended for success upon the initiative, judgment or foresight of the typical independent contractor.

Everything the Court said about boning at Kaiser is true about detasseling and rogueing at Remington. Detasseling is a specialty job in an agricultural operation that includes additional steps to produce hybrid corn. Zarate had no business organization that he could shift from one place to another; he put together a crew for Remington alone. Zarate's workers took instruction from him but followed work rules that Remington laid down. They started at Remington's headquarters with a briefing about pesticide safety. Remington supplied the tools (and the outhouses). Remington posted supervisors in the fields to inspect the work and tell the crew when the job had to be re-done. Just as in *Rutherford Food*, a firm hired a single person to supply a labor force rather than a defined product (such as a working elevator or a legal brief). And the result, as in *Rutherford Food*, was a single operation under "common control" (§203(s)) rather than a distinct activity—for example, plumbing repairs—conducted by an independent contractor who appears, does a discrete job, and leaves again.

Every employer—Zarate no less than Remington—has the same duties under the FLSA and AWPA. The rule of

liability won't matter when the number of parties is small and no one is judgment-proof. See R.H. Coase, *The Problem of Social Cost*, 3 J.L. & Econ. 1 (1960). If an independent contractor is a solvent business, then the workers are protected by that contractor's incentive to follow the law (for violations could cripple the business) and his ability to pay damages if he does not. The firm that hires the contractor pays up front for the costs of compliance. If Zarate had been solvent, Remington would have had to offer him enough that he could pay all of the workers' wages (including the minimum wage and any overtime premium), cover the costs of fringe benefits such as housing, and still be able to make a profit. But when a contractor has no business or personal wealth at risk, he may be tempted to stiff the workers (as Zarate did), and then treating the principal firm as a separate employer is essential to ensure that the workers' rights are honored. (This is not to say that §203(d) and the regulation are limited to situations in which the "independent contractor" is thinly capitalized; our point, rather, is that this is when they matter most.)

If everyone abides by the law, treating a firm such as Remington as a joint employer will not increase its costs. Recall that it must pay any labor contractor enough to cover the workers' legal entitlements. Only when it hires a fly-by-night operator, such as Zarate, or one who plans to spurn the FLSA (as Zarate may have thought he could do), is Remington exposed to the risk of liability on top of the amount it has agreed to pay the contractor. And there are ways to avoid this risk: either deal only with other substantial businesses or hold back enough on the contract to ensure that workers have been paid in full.

Holdbacks are standard in the construction business. A general contractor (or project owner) that hires a small, thinly capitalized subcontractor to do a specialized job such as electrical work or plumbing will not make the

final payment until the subcontractor demonstrates that it has fully compensated its own workers. That practice grew up in part because construction workers may obtain a lien on the project; Zarate's crew did not have a lien on the hybrid corn. But holdbacks, sometimes accompanied by bonds that put reliable insurers behind the family-owned electrical subcontractors, are equally available to firms outside the construction business. We asked at oral argument why Remington had not retained enough to ensure that Zarate's workers were paid and all federal taxes withheld and remitted. The answer might have been that Remington knew that Zarate was illiquid, so holdbacks would have rendered him bankrupt (that's why Remington was advancing money rather than using retainages). But the actual answer was that Remington's lawyer had never heard of holdbacks and performance bonds. Remington may have received bad legal advice, but as between Remington and the workers Remington is in much the superior position to ensure Zarate's compliance with the FLSA and AWPA.

*Rutherford Food* requires judgment in the workers' favor under the FLSA. None of the (few) factual disputes is material; everything we have mentioned in this opinion is uncontested and is enough to resolve the main issues—though questions about damages remain to be decided on remand. It is unclear how much what Zarate paid the plaintiff fell short of the minimum wage due under the FLSA.

Because the AWPA and FLSA use the same definition of "employ," Remington must be deemed the workers' employer for events that occurred in the fields under its management or in its offices. The workers contend that Remington exposed them to pesticides without proper training or equipment, failed to post required notices, supplied substandard housing, and failed to provide sanitary facilities that met minimum standards. Claims

relating to pesticides, notices, and sanitation arise from events on the premises and thus are covered by the statutory definition. See also 29 U.S.C. §1821(d) (obligation to keep records of hours worked), §1822(a) (obligation to pay all wages owed by contract), §1822(c) (obligation to keep other promises); §1855(a) (obligation not to retaliate against those who assert their rights under the AWPA).

Plaintiffs' AWPA claim relating to housing was properly dismissed by the district court, however. Remington did not provide the workers' housing, all of which was well off its premises—and, as we have already mentioned, it obtained from Zarate a promise that he would not provide housing either. (Zarate's state certification as an agricultural labor contractor was limited; he lacked legal authority to supply the crew with dwelling quarters.)

Although the workers say that Remington had to have appreciated that Zarate exceeded his authority, because Remington provided a bus that (at least for the first week) picked the workers up and transported them to the fields, this shows only that Remington knew that the workers *had* housing. Remington's deal with Zarate was that he would pay the crew enough that the workers could rent their own rooms. To observe that the workers were living indoors rather than on the streets is not to observe that Zarate rather than the workers themselves had dealt with landlords to secure space. None of the plaintiffs contends that he told Remington that Zarate had engaged and paid for the housing; there is therefore no dispute on that score requiring a trial.

As for the notices required by the AWPA: again there is no material dispute. Remington's witnesses testified (by deposition or affidavit in discovery) that it had posted everything the law requires, and more. Several plaintiffs conceded in discovery that they had seen these notices. A few plaintiffs said in their depositions that they could not

recall seeing the notices. Scattered claims of "I can't recall whether X occurred" do not create a material dispute, when everyone who *can* recall agrees that X did occur.

So what remain for decision are the damages for any violations of the FLSA (some workers may have been fully paid; the shortfall for others must be calculated) and further proceedings to determine whether the pesticide protocols and sanitation were deficient—and, if so, the damages to which the plaintiffs are entitled under these and the other portions of the AWPA that we have identified as requiring additional inquiry. The judgment of the district court is vacated, and the case is remanded for further proceedings on these subjects; otherwise the judgment is affirmed.

A true Copy:

      Teste:

                _____

                *Clerk of the United States Court of*
                    *Appeals for the Seventh Circuit*