# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MARIA ESPINOZA and JUAN FRANCISCO HERNANDEZ TORRES, | DIVISION ONE |
| Appellants, | No. 76752-6-I |
| v. | UNPUBLISHED OPINION |
| MH JANITORIAL SERVICES LLC, EXPERT JANITORIAL, LLC, ALL AMERICAN JANITORIAL LLC, ESTEBAN HERNANDEZ, and RAUL CAMPOS, | |
| Defendants, | |
| FRED MEYER STORES, INC., | FILED: November 4, 2019 |
| Respondent. | |

DWYER, J. — This appeal is a continuation of the long-running dispute between Fred Meyer Stores, Inc. and a group of janitors who cleaned Fred Meyer stores from September 16, 2011 through September 23, 2014. Fred Meyer contracted out its janitorial work to Expert Janitorial, LLC (Expert). Expert, in turn, subcontracted the work to All American Janitorial LLC (AAJ) and M. H. Janitorial LLC (MHJ), who directly employed the appellant janitors.

The janitors brought suit against their direct employers and against Expert and Fred Meyer, alleging violations of Washington's Minimum Wage Act (MWA), chapter 49.46 RCW. The janitors alleged that both Expert and Fred Meyer were their joint employers under the MWA and were liable for their unpaid wages. Employing the "economic reality" test adopted by our Supreme Court in <u>Becerra Becerra v. Expert Janitorial, LLC</u>, 181 Wn.2d 186, 332 P.3d 415 (2014), the trial court concluded that Expert, AAJ, and MHJ were liable to the janitors for violations of the MWA but that Fred Meyer was not the janitors' joint employer and was, therefore, not liable. The janitors appeal, asserting that the trial court misapplied the "economic reality" test and made findings of fact that are unsupported by substantial evidence. Because the trial court properly applied the "economic reality" test and its factual findings are supported by substantial evidence, we affirm.

I

Prior to 2004, Fred Meyer employed full time janitors to clean its stores at night. But in 2004, in an effort to reduce the time store managers had to spend focusing on building maintenance and to reduce costs, Fred Meyer decided to outsource its janitorial work. Fred Meyer contracted with a company eventually purchased by Expert to clean some of its retail stores in the Puget Sound area.[1] From September 2011 through September 2014, Fred Meyer paid Expert approximately $4,000,000 annually for cleaning services.

During that time period, Expert was a nationwide janitorial services

---

[1] Fred Meyer first contracted with Industrial Cleaning Management LLC, which later became Janitorial Management Services LLC, which was then acquired by Expert.

company that provided over 500,000 separate cleaning services a year to various clients. However, rather than directly perform cleaning services, Expert subcontracted 100 percent of its janitorial work. As part of its service to customers, Expert promised to monitor the quality of its subcontractors' work as well as its subcontractors' compliance with wage and hour and immigration laws.

Under its contract with Fred Meyer,[2] Expert was explicitly tasked with ensuring that its subcontractors complied with labor laws. The contract set forth a detailed scope of daily work, and, until May 2014, required Fred Meyer personnel to formally inspect and approve the janitors' work each day.

Starting in late 2009 or early 2010, Expert subcontracted a portion of the Fred Meyer janitorial work to AAJ. Initially, AAJ did not classify any of its janitors as employees. This changed when a group of its janitors filed a class action lawsuit against AAJ, Expert, and Fred Meyer in 2010 (the Beccera lawsuit). At that time, AAJ began converting the janitors from independent contractor status to employee status. However, by the time AAJ's owner gave deposition testimony in the Becerra lawsuit in August 2011, he had only converted approximately half of his janitors to employee status.

Meanwhile, the Becerra lawsuit prompted Expert to perform an audit of its Washington subcontractors to determine whether the subcontractors were violating wage and hour laws. This audit revealed to Expert that the subcontractors it hired to work on the Fred Meyer contract were, in fact, violating wage and hour laws. Expert did not share the results of this audit with Fred

---

[2] Expert's contract with Fred Meyer went unchanged from Fred Meyer's original contract with Industrial Cleaning Management LLC in 2004 through May 2014.

3

Meyer.

Expert, concerned about the misclassification of janitors at AAJ and its other subcontractors' labor law violations, looked for a new janitorial company to take over the Fred Meyer work. Expert's solution was to have a manager of one of its other janitorial subcontractors start a new janitorial business to which Expert could then subcontract all of the Fred Meyer contract work. This new company was MHJ. Expert began transitioning the Fred Meyer contract work to MHJ in early December 2011.

In mid-December 2011, the owner of AAJ disappeared. He left with all of AAJ's cleaning equipment and without paying any of the AAJ janitors for their work in the most recent pay period. Expert quickly moved to transfer all of the stores for which AAJ was responsible to MHJ, which assumed responsibility for AAJ's contract. Expert further assisted in transferring all of AAJ's janitors to MHJ. Additionally, Expert offered to pay the AAJ janitors their unpaid wages in exchange for a release of liability. Expert ultimately paid $97,550 to MHJ so that it could then issue paychecks to 48 former AAJ janitors for the work they performed while employed by AAJ.

Subsequently, in May 2012, following an audit by the Department of Labor and Industries Workers' Compensation Division, MHJ administrators came to mistakenly believe that they could pay janitors on a salary basis and stop tracking janitor hours. As a result, MHJ immediately stopped tracking its janitors' hours and paid them a salary.

In late July 2012, a community organization calling itself the "Stop Wage

4

Theft Coalition" sent Fred Meyer a letter raising questions about whether the janitors working in its stores were being paid in accordance with labor laws. Fred Meyer forwarded this letter to Expert, who sent a response letter to both Fred Meyer and the community organization. Therein, Expert asserted that it was regularly auditing its subcontractors to ensure that they complied with all labor laws, that a Department of Labor and Industries audit had found that MHJ was in full compliance with labor laws, that any prior problems regarding AAJ were firmly in the past, and that Expert had ensured that none of the compliance issues of past subcontractors carried over to MHJ. As it turned out, these assertions were either completely false or at best very misleading. Expert was not regularly auditing MHJ, and the Department of Labor and Industries audit had not been a wage and hour audit but, rather, a workers' compensation audit.

Shortly thereafter, MHJ learned that it was under investigation by the United States Department of Labor for its classification of the janitors as salaried employees. Immediately upon learning that such a practice was impermissible, MHJ began classifying the majority of its janitors as hourly wage employees and instituted policies to track each janitor's hours.[3]

In May 2013, Expert sent a letter to community groups and Fred Meyer informing them of the Department of Labor investigation. Therein, Expert explained that it was continuing to regularly audit MHJ, that it expected the

---

[3] However, MHJ continued to classify its floor waxing janitors on a salary basis through all of 2013, mistakenly believing that this was permissible because waxers chose when to start each evening and could leave whenever they concluded their work. Furthermore, MHJ informed its janitors not to claim more than seven hours per shift regardless of the actual time worked because that was all MHJ could afford to pay them.

federal investigation to address only the salary classification violations, and that the misclassification of janitors as salaried employees had already been corrected. Again, the representation that Expert was regularly auditing MHJ was untrue.

The Department of Labor subsequently sent Fred Meyer a spreadsheet with its wage calculations setting forth the amount it believed MHJ owed to its janitors through 2013, at which point Fred Meyer realized that there were other alleged violations of wage laws committed by MHJ through 2013. This spreadsheet, however, included wages owed to janitors who did not work at Fred Meyer stores. The Department did not provide Fred Meyer with any details regarding other alleged violations, nor did it provide any details to identify which of the janitors it asserted were owed wages worked at Fred Meyer stores.

In 2014, Fred Meyer learned that the Department of Labor considered Fred Meyer to be a joint employer of the janitors because Fred Meyer employees had to inspect and approve the janitors' daily work. As a result, Fred Meyer sought to renegotiate its contract with Expert. In May 2014, Fred Meyer signed a new contract with Expert removing this requirement. The new agreement also reduced the scope of the work and the contract price, and required Expert to pay Fred Meyer an annual $1,000,000 rebate. However, Fred Meyer subsequently agreed to forgo this annual rebate, and instead received only a one-time rebate of $200,000.

In September 2014, the appellant janitors filed this lawsuit, seeking to represent the class of janitors who performed janitorial work in Fred Meyer stores

for AAJ and MHJ between September 16, 2011 and September 23, 2014. The janitors asserted that AAJ and MHJ violated the MWA and sought to hold Expert and Fred Meyer liable, as joint employers, for AAJ's and MHJ's violations. After a bench trial, the trial court concluded that AAJ and MHJ had violated the MWA, that Expert was the janitors' joint employer under the MWA and was therefore liable for those violations, and that Fred Meyer was not the janitors' joint employer under the MWA.

The janitors appeal.

II

The janitors contend that the trial court erred when it concluded that Fred Meyer was not their joint employer under the MWA. This is so, the janitors assert, because the trial court made several findings of fact that are not supported by substantial evidence, which led the trial court to perform an erroneous evaluation of the "economic reality" of the relationship between Fred Meyer and the janitors. We disagree.

A

In Becerra, our Supreme Court articulated a nonexclusive 16 "factor" "economic reality" test for determining whether an entity is a joint employer under the MWA. 181 Wn.2d at 196-98. Under this test, the ultimate determination of whether an entity is a joint employer under the MWA is a question of law, but the existence and degree of each of the "factors" is a question of fact. Becerra Becerra v. Expert Janitorial, LLC, 176 Wn. App. 694, 705-06, 309 P.3d 711 (2013), aff'd 181 Wn.2d 186. "Questions of law and conclusions of law are

reviewed de novo." Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 880, 73 P.3d 369 (2003). "Findings of fact are reviewed under a substantial evidence standard, defined as a quantum of evidence sufficient to persuade a rational fair-minded person the premise is true. If the standard is satisfied, a reviewing court will not substitute its judgment for that of the trial court even though it might have resolved a factual dispute differently."[4] Sunnyside Valley Irrig. Dist., 149 Wn.2d at 879-80 (citation omitted) (citing Wenatchee Sportsmen Ass'n v. Chelan County, 141 Wn.2d 169, 176, 4 P.3d 123 (2000); Croton Chem. Corp. v. Birkenwald, Inc., 50 Wn.2d 684, 314 P.2d 622 (1957)).

In Becerra, our Supreme Court explained that Washington courts look to federal Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. §§ 201-19, jurisprudence when interpreting the MWA. 181 Wn.2d at 195. Recognizing that federal courts have set forth many different "factors" that may be relevant to the joint employment inquiry, our Supreme Court chose to adopt the nonexclusive 13 "factor" "economic reality" test as set forth in Torres-Lopez v. May, 111 F.3d 633, 639-40 (9th Cir. 1997). This included five formal or regulatory "factors" and eight common law "factors." Becerra, 181 Wn.2d at 196-97. The five formal or regulatory "factors" are:

> "(A) The nature and degree of control of the workers;
> (B) The degree of supervision, direct or indirect, of the work;
> (C) The power to determine the pay rates or the methods of payment of the workers;
> (D) The right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; [and]

---

[4] The janitors' briefing urges us to "take into account all of the evidence relating" to the trial court's findings "in order to evaluate whether the findings satisfy" a preponderance of the evidence test. In other words, the janitors ask us to step into the trial court's role and reweigh the evidence. We decline to do so.

(E) Preparation of payroll and the payment of wages."

Torres-Lopez, 111 F.3d at 639-40 (alteration in original) (quoting 29 C.F.R. § 500.20(h)(4)(ii)).[5]

The eight non-regulatory common law "factors" are:

(1) whether the work was a "specialty job on the production line," Rutherford [Food Corp. v. McComb], 331 U.S. [722,] 730, 67 S. Ct. [1473, 91 L. Ed. 1772 (1947)];
(2) whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to another without "material changes," [Rutherford, 331 U.S. at 730];
(3) whether the "premises and equipment" of the employer are used for the work, [Rutherford, 331 U.S. at 730]; see also Real [v. Driscoll Strawberry Associates, Inc.], 603 F.2d [748,] 754 [(9th Cir. 1979)] (considering the alleged employee's "investment in equipment or materials required for his task, or his employment of helpers");
(4) whether the employees had a "business organization that could or did shift as a unit from one [worksite] to another," Rutherford, 331 U.S. at 730;
(5) whether the work was "piecework" and not work that required "initiative, judgment or foresight," [Rutherford, 331 U.S. at 730]; see also Real, 603 F.2d at 754 (considering "whether the service rendered requires a special skill");
(6) whether the employee had an "opportunity for profit or loss depending upon [the alleged employee's] managerial skill," Real, 603 F.2d at 754;
(7) whether there was "permanence [in] the working relationship," [Real, 603 F.2d at 754]; and
(8) whether "the service rendered is an integral part of the alleged employer's business," [Real, 603 F.2d at 754].

Torres-Lopez, 111 F.3d at 640 (some alterations in original).

The Supreme Court also recognized three additional "factors" from other

---

[5] Although these regulatory "factors" are set forth in regulations pertaining to the Migrant and Seasonal Agricultural Worker Protection Act (AWPA), 29 U.S.C. §§ 1801-1872, rather than those pertaining to the FLSA, the Torres-Lopez court utilized them to analyze claims brought under both the FLSA and the AWPA. 111 F.3d at 644. Similarly, our Supreme Court clearly directed that these "factors," though stemming from regulations pertaining to the AWPA rather than the FLSA, are applicable to a joint employment analysis under the MWA.

federal cases noted by our <u>Becerra</u> decision (the opinion then on review), specifically, "whether the putative joint employer knew of the wage and hour violation, whether it paid sufficient amounts to the subcontractors to allow for a lawful wage, and whether the subcontracting arrangement is a 'subterfuge or sham.'" <u>Becerra</u>, 181 Wn.2d at 198 (internal quotation marks omitted) (quoting <u>Becerra</u>, 176 Wn. App. at 719). While our Supreme Court explicitly identified 16 "factors" that a trial court should consider when determining whether an entity is a joint employer, it noted that the "factors are not exclusive and are not to be applied mechanically or in a particular order." <u>Becerra</u>, 181 Wn.2d at 198. "As the United States Supreme Court noted long ago, '[T]he determination of the relationship does not depend on such isolated factors but rather upon the circumstances of the whole activity.'" <u>Becerra</u>, 181 Wn.2d at 198 (alteration in original) (quoting <u>Rutherford</u>, 331 U.S. at 730). Indeed, under the FLSA approach adopted by our Supreme Court in <u>Becerra</u>, "[t]he court is also free to consider any other factors it deems relevant to its assessment of the economic realities." <u>Zheng v. Liberty Apparel Co. Inc.</u>, 355 F.3d 61, 71-72 (2d Cir. 2003).

While courts have generally used the term "factors" to describe the considerations a court should ponder when evaluating the circumstances of the relationship between a putative employer and an employee, these "factors" are not akin to elements. The economic reality test "offers a way to think about the subject and not an algorithm. That's why toting up a score is not enough." <u>Reyes v. Remington Hybrid Seed Co., Inc.</u>, 495 F.3d 403, 408 (7th Cir. 2007). Accordingly, we will refer to the <u>Becerra</u> considerations herein as "things to think

about," which more clearly denotes their function within the "economic reality" test, rather than as "factors."

B

Before we reach the janitors' contentions on appeal regarding the trial court's findings, we note three misunderstandings of the law pervasive in their argument on appeal.

First, the janitors assert that because (in their view) the trial court erred in several of its factual findings regarding the "things to think about" set forth in Becerra and the trial court termed the case against Fred Meyer a very close call, any error in the trial court's findings regarding any of the Becerra "things to think about" necessitates "at least a remand." The janitors are mistaken.

The janitors' argument that rejecting any of the trial court's findings would require remand or reversal fundamentally misunderstands the nature of the "economic reality" test. The janitors' chosen analytical method is entirely inconsistent with our Supreme Court's warning that the "things to think about" when evaluating the economic reality of a relationship between a putative employer and employee "are not exclusive and are not to be applied mechanically or in a particular order," Becerra, 181 Wn.2d at 198, and the United States Supreme Court's express warning that "the determination of the relationship does not depend on such isolated factors but rather upon the circumstances of the whole activity." Rutherford, 331 U.S. at 730. The janitors' assertion flies in the face of Judge Easterbrook's warning in Reyes that "toting up a score is not enough." 495 F.3d at 408.

11

This flaw in the janitors' analytical approach is prevalent throughout their briefing. The janitors isolate individual "things to think about" for discussion, leaving only the last few pages of their brief for discussion of the "circumstances of the whole activity." Cf. Rutherford, 331 U.S. at 730. As the United States Supreme Court noted in United States v. Arvizu, 534 U.S. 266, 274, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002), when engaged in a totality of the circumstances analysis, considering "factors in isolation from each other does not take into account the 'totality of the circumstances,' as our cases have understood that phrase." Indeed, we also recently clarified that "[a] totality of the circumstances analysis is a cumulative analysis, not a 'divide-and-conquer' analysis." State v. Johnson, 8 Wn. App. 2d 728, 745, 440 P.3d 1032 (2019).

Even in their last few pages of briefing, wherein the janitors address the totality of the circumstances, the janitors simply tote up a score by listing the "things to think about" that the trial court found indicated joint employment. This is not a proper implementation of the "economic reality" test. See, e.g., Becerra, 181 Wn.2d at 198; accord Rutherford, 331 U.S. at 730; Reyes, 495 F.3d at 408. The "economic reality" test is not a numbers game. For example, even if all but one of the "things to think about" identified in Becerra weighed against joint employment, if the CEO of Fred Meyer took the stand and testified that the decision to contract out janitorial work was a sham designed to avoid compliance with labor laws, that alone could lead a court to conclude that Fred Meyer was a joint employer.

12

Second, the janitors support many of their arguments by citing to our prior decision in Becerra, and contending that we therein made conclusive factual findings that bound the trial court on remand. This is not so. Our decision in Becerra reversed an order granting summary judgment. 176 Wn. App. at 700. Therein, we reviewed the evidence presented at the motion hearing in the light most favorable to the janitors (the nonmoving parties) and concluded that there were genuine issues of material fact requiring trial. Becerra, 176 Wn. App. at 699-700. However, that there was sufficient evidence to permit a trier of fact to draw an inference supporting the janitors' contention of joint employment—thus necessitating a trial—did not mean that the trier of fact was required to draw that inference following the presentation of evidence at the trial. When a case is tried, "the trier of the facts is in a position to say, at the conclusion of the plaintiffs' case, that it does or does not, draw an inference [supporting plaintiffs]." Tuengel v. Stobbs, 59 Wn.2d 477, 478, 367 P.2d 1008 (1962). Thus, our Becerra decision did not make conclusive factual findings that were binding on the trial court.

Third, the janitors appear to misunderstand CR 52, which sets forth the requirements for findings of fact made by trial judges in bench trials. See CR 52(a). The janitors assert in their briefing that the trial court failed to consider all of the evidence regarding certain findings of fact because it did not explicitly discuss all of the evidence presented in the sections of its memorandum decision setting forth the challenged findings of fact. CR 52(a), however, does not require trial court judges to address every contention of the parties or catalog every

13

single piece of evidence presented and explain whether it was credited and whether it supports or contravenes each finding. See Daughtry v. Jet Aeration Co., 91 Wn.2d 704, 707, 592 P.2d 631 (1979). Instead, the rule requires that trial courts presiding over bench trials make sufficiently specific findings of fact supporting their decisions so as to allow for meaningful appellate review. In re Dependency of A.D., 193 Wn. App. 445, 462, 376 P.3d 1140 (2016). The findings must, for all material issues, inform the appellate court of the questions decided and the manner in which they were decided. Daughtry, 91 Wn.2d at 707 (quoting Bowman v. Webster, 42 Wn.2d 129, 134, 253 P.2d 934 (1953)). The trial court's 67 page memorandum decision sufficiently accomplished this task.

C

The janitors contend that the trial court erred when it considered the totality of the circumstances and concluded that Fred Meyer was not the janitors' joint employer. This is so, the janitors assert, because the trial court erred in six of its factual findings regarding the "things to think about" set forth by our Supreme Court in Becerra. We disagree.

1

The janitors first contend that the trial court erred when it found that the degree of Fred Meyer's supervision of the janitors' work does not weigh in favor of concluding that Fred Meyer was the janitors' joint employer. This is so, they assert, because the trial court's finding is premised on an erroneous view of controlling law and is not supported by substantial evidence. The janitors specifically aver that the trial court improperly disregarded Fred Meyer's indirect

supervision of the janitors and that the trial court made internally contradictory findings about whether Fred Meyer employees supervised the janitors' work. We disagree.

The janitors' assertion that the trial court incorrectly disregarded Fred Meyer's indirect supervision of the janitors is premised on a belief that the right to inspect an employee's work always constitutes indirect supervision weighing in favor of joint employment, but that is not the law.[6] In Zheng, the Second Circuit explained that the supervision "factor" of the "economic reality" test "can be misinterpreted to encompass run-of-the-mill subcontracting relationships." 355 F.3d at 74. The court went on to explain that "supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting arrangement."[7] Zheng, 355 F.3d at 75.

Herein, the trial court found that Fred Meyer employees did not direct janitors how to perform their work and were not watching the janitors while they

---

[6] In support of this position, the janitors cite almost exclusively to our prior decision in Becerra. The janitors contend that our Becerra decision held that the work order process was, standing alone, sufficient evidence to require a finding of indirect supervision indicating joint employment. This is incorrect. Our Becerra decision merely stated that such evidence could support an inference of indirect supervision indicating joint employment, not that it always supports such an inference, and that it therefore presented a genuine issue of material fact necessitating resolution at trial. 176 Wn. App. at 718.

[7] This is by no means the only type of supervision that does not always support a finding that an entity is a joint employer. For example, in Moreau v. Air France, 356 F.3d 942, 951 (9th Cir. 2004), the Ninth Circuit explained that the putative joint employer therein, Air France, was "very specific about how it wanted its work performed, and it checked to ensure that its standards were met and that the service provider's overall performance adhered to Air France's specifications." The court went on to explain that "[t]his type of activity can, in some situations, constitute 'indirect' supervision of the employees' performance." Moreau, 356 F.3d at 951 (emphasis added). The court ultimately concluded, however, that the quality control provided by Air France did not constitute indirect supervision within the meaning of the "economic reality" test because much of the supervision was directed towards ensuring compliance with safety and security regulations. Moreau, 356 F.3d at 951.

15

worked. According to the janitors this finding is contrary to other trial court findings—specifically that Fred Meyer employees had "eyes on" the janitors and required the janitors to complete floor cleaning by midnight to enable Fred Meyer employees to restock shelves—and disregards the inspections Fred Meyer staff would conduct before the janitors could leave each day.[8] These contentions are meritless.

First, Fred Meyer's daily quality control inspection is exactly the sort of indirect supervision that the Zheng court explicitly noted does not necessarily weigh in favor of joint employment. 355 F.3d at 75. Second, the trial court's findings that Fred Meyer employees had "eyes on" the janitors is plainly not inconsistent with the finding that Fred Meyer employees did not watch the janitors work. Seeing someone working in the same building as oneself is not the same thing as watching them work or supervising them. Third, the trial court's finding that Fred Meyer employees did not instruct janitors how to clean the floors is also plainly not contradicted by a finding that Fred Meyer required access to their own store floor after midnight, even though this modified the order in which the janitors performed their cleaning tasks. The janitors fail to establish

---

[8] The janitors also contend that it was inconsistent for the trial court to find that Fred Meyer had sufficient control over the workers to support a conclusion that Fred Meyer was a joint employer but did not sufficiently supervise them to support the same conclusion. They provide no support for this plainly incorrect assertion. An entity can control workers without supervising their work. Similarly, the janitors also contend that it is inconsistent for the trial court to have found that Expert supervised the janitors while finding that Fred Meyer did not. But the trial court explained in its decision that Expert actually instructed the janitors on how to perform their cleaning work, while Fred Meyer never did. Additionally, the janitors contend that Fred Meyer's actions barring janitors from returning to Fred Meyer stores after those janitors stole from the stores constitutes supervision. But Fred Meyer protecting itself from theft is not necessarily indicative of joint employment, as Fred Meyer would presumably bar anyone who stole from its stores, regardless of whether the person was an employee.

that the trial court's findings regarding Fred Meyer's supervision of the janitors are premised on an error of law or are not supported by substantial evidence.

2

The janitors next contend that the trial court erred when it found that Fred Meyer did not sufficiently determine the janitors' pay rates and method of payment to indicate that Fred Meyer was the janitors' joint employer. This is so, the janitors assert, not because Fred Meyer directly set the janitors' wages or determined when and how they were paid, but because Fred Meyer had the authority under its contract with Expert to require Expert to ensure that janitors were paid wages compliant with the MWA.[9] The janitors' contention is not well taken.

To support their position that Expert's contractual obligation to ensure that its subcontractor janitorial companies paid their janitors MWA compliant wages weighs in favor of Fred Meyer being a joint employer, the janitors cite to Torres-Lopez. But this case does not support the janitors' assertion that requiring compliance with minimum wage laws gives a putative joint employer the power to determine a subcontractor's employees' wages. Therein, a cucumber farm, Bear Creek Farms, employed a labor contractor to hire farmworkers to harvest its cucumber crop. Torres-Lopez, 111 F.3d at 637. The contract between Bear Creek Farms and its labor contractor assigned responsibility for compliance with

---

[9] The janitors also assert that the trial court found that Fred Meyer did control how Expert spent its money because the trial court stated that when Fred Meyer became aware of a lawsuit against it and Expert in 2009, Fred Meyer "instructed Expert's Phil Pacey to find a way to resolve it." According to the janitors, because Expert subsequently paid to settle the claims against it and Fred Meyer, Fred Meyer had control over how Expert spent its money. But directing a contractor to resolve a lawsuit is not necessarily the same thing as controlling how that contractor spends money. The trial court was free to view the evidence as it did.

wage laws to the labor contractor. Torres-Lopez, 111 F.3d at 637 n.3. When analyzing whether Bear Creek Farms was a joint employer, the Ninth Circuit concluded that

> Bear Creek Farms was not involved in preparing the farmworkers' payroll or directly paying their wages. The record does show, however, that Bear Creek Farms exercised some power in determining the pay rates for the farmworkers during the early part of the harvest. It is undisputed that Bear Creek Farms increased [the labor contractor]'s compensation during the first picking of the cucumbers in order to allow the farmworkers to draw higher wages.

Torres-Lopez, 111 F.3d at 643.

The Ninth Circuit's analysis focused on whether "Bear Creek Farms exercised some power in determining the pay rates for the farmworkers," not whether Bear Creek Farms had "contractual power" to require its labor contractor to comply with wage laws. Torres-Lopez, 111 F.3d at 643. Thus, Torres-Lopez does not support the janitors' contention that assigning contractual responsibility for compliance with wage laws to a contractor constitutes power to determine the rate or method of payment of wages to that contractor's subcontractors.

Indeed, that Fred Meyer relied on contractual assurances that Expert would require its subcontractors to pay MWA compliant wages actually weighs against joint employment. Rather than specifying the janitors' rate or manner of pay in its contract with Expert, Fred Meyer merely agreed to pay Expert to provide janitorial services that were compliant with wage laws. When they signed the contract, Fred Meyer and Expert agreed that the contract price Fred Meyer would pay Expert provided sufficient funds to guarantee MWA compliant wages for Expert's subcontractor janitors. The contract did not state how Expert

18

would go about ensuring wage compliance or require any specific method or rate of payment to the janitors. Fred Meyer merely provided the money Expert insisted it needed to provide MWA compliant wages and left the rest to Expert.[10] Such a contract supports a finding that Fred Meyer did not exercise control over the janitors' rate or method of payment but, rather, left it to Expert.[11] The janitors do not establish that the trial court's finding that Fred Meyer did not determine the janitors' rate or method of payment is premised on an incorrect interpretation of controlling law or is unsupported by substantial evidence.

3

The janitors next contend that the trial court erred when it found that Fred Meyer did not have the right to hire, fire, or affect the janitors' employment conditions and that this weighed against joint employment. This is so, the janitors assert, because the trial court's finding is premised on an incorrect

---

[10] Fred Meyer never knew how much Expert paid its subcontractor janitorial companies and what those companies were paying their employees. As the trial court noted in its decision, Expert did not take such a hands off approach to its subcontractor MHJ. Instead, Expert specifically directed the manner in which MHJ paid its employees, including by prohibiting them from hiring subcontractors and insisting that MHJ classify their janitors as employees and pay them W-2 wages. Expert also helped MHJ institutionalize policies for payment of overtime compensation and for accurately completing timesheets and taking breaks. Although the janitors do not challenge these findings, they nevertheless insist that the trial court did not provide any reasons to justify finding that Expert did exercise control over the janitors' wages while also finding that Fred Meyer did not. We do not agree.

[11] The janitors also contend that Fred Meyer's flat rate payment to Expert set a cap on the janitors' potential wages and that Fred Meyer thus exercised indirect control over the janitors' rate of payment. Ninth Circuit precedent does indicate that determining the amount paid to a subcontractor "may ultimately determine the amount the [employees] are paid for their labor." Real v. Driscoll Strawberry Assocs., Inc., 603 F.2d 748, 756 (9th Cir. 1979). However, here the trial court considered this argument and found that no evidence established that Fred Meyer's payments were insufficient to permit the janitors to receive MWA compliant wages. The janitors do not challenge this finding. Furthermore, the record further supports the trial court's determination because when Fred Meyer negotiated a price reduction with Expert in 2014, the amount Expert paid to its subcontractor janitorial companies did not change. The janitors do not point to any evidence in the record to connect what Fred Meyer paid Expert to what Expert paid its subcontractor janitorial companies.

application of controlling law and is not supported by substantial evidence. The janitors specifically aver that the trial court improperly disregarded Fred Meyer's indirect control over janitors and that because the trial court found that Expert had the right to hire, fire, or affect the janitors' employment conditions, it should have found that Fred Meyer had the same rights.[12] Once again, these contentions are meritless.

In support of their argument that the trial court improperly disregarded Fred Meyer's indirect control, the janitors cite only to our prior decision in Becerra. The janitors assert that our Becerra decision required a finding that Fred Meyer's requests to Expert that certain janitors not return to Fred Meyer stores supports a conclusion that Fred Meyer was the janitors' joint employer. However, as already noted, our Becerra decision did not compel the trial court to make such a finding. Instead, it merely held that such requests presented a genuine issue of material fact with respect to Fred Meyer's power to alter the janitors' employment conditions. Becerra, 176 Wn. App. at 718. The trial court, as the trier of fact, was free to conclude after trial that such requests did not

---

[12] The janitors also contend that the trial court's finding that Fred Meyer had no control over the hiring or firing of janitors is not supported by substantial evidence because of one e-mail exchange between representatives of Fred Meyer and Expert that the janitors assert discusses whether to fire a team of janitors. Therein, the Fred Meyer representative, addressing concerns that a Fred Meyer manager may have incorrectly accused janitors of destroying store property, wrote that "[n]o one is to be terminated till we all talk." The janitors assert that this e-mail required a finding that Fred Meyer had the power to fire janitors. The janitors are wrong. Testimony at trial by representatives of Expert established that they did not view Fred Meyer as having the authority to fire janitors. Moreover, further review of the e-mail exchange in question reveals that there was never a plan to terminate the janitors in the first place but, rather, to simply transfer them to another store to appease a Fred Meyer store manager mistakenly convinced that those janitors had destroyed property.

20

establish that Fred Meyer had the power to hire, fire, or affect the janitors' employment conditions.

Furthermore, it is evident from the trial court's memorandum decision that it did consider Fred Meyer's ability to indirectly affect the employment conditions of the janitors.[13] In fact, the janitors actually cited to the trial court's decision in their briefing, rather than directly to the record, to identify the evidence that they assert the trial court did not consider. Specifically, the janitors assert that because (1) janitors were transferred if Fred Meyer complained about their work to Expert and (2) Fred Meyer let the janitors use the employee door to enter and leave the stores, Fred Meyer's control over the janitors' employment conditions weighs in favor of joint employment and the trial court's contrary finding is not supported by substantial evidence.[14] We do not agree.

The janitors do not provide any legal support for their argument that Fred Meyer's complaints about underperforming janitors constituted control over the janitors sufficient to make Fred Meyer their joint employer.[15] Indeed, were this

---

[13] The janitors also contend that the trial court improperly disregarded Fred Meyer's actions in banning janitors who stole from its stores. This is also incorrect. The trial court clearly considered this evidence in its memorandum decision, but found that such actions were not indicative of joint employment because Fred Meyer would have banned anyone who stole from its stores, be they employee, contractor, or customer.

[14] The janitors also assert that the fact that Fred Meyer could refuse to allow the janitors to leave if they believed the janitors had not satisfactorily completed their work requires finding that Fred Meyer had the authority to hire, fire, or affect the employment condition of the janitors. They assert that the trial court improperly did not consider this when it found that Fred Meyer's power to affect the janitors' employment condition did not support joint employment. The janitors are incorrect. It is apparent that the trial court considered Fred Meyer to have exercised control over the workers; it explicitly stated as much in its decision. Just because the trial court did not specifically restate its finding regarding Fred Meyer's control over the workers in the section of its memorandum decision discussing whether Fred Meyer had the power to hire or fire janitors does not mean it ignored that consideration. As already noted herein, the trial court was not required to repeatedly list and break down every piece of evidence that weighed in favor of or weighed against each of its findings.

[15] Fred Meyer, however, cites to several published federal district court decisions as persuasive authority that support the notion that businesses do not hire or fire a contractor's

21

the case, any customer who complained to a contractor about the performance of a subcontractor's employees would be an employer. Customers do not have to withhold their complaints about underperforming contractors to avoid liability as a joint employer.

The janitors' second contention—that Fred Meyer's decision to allow the janitors to access its stores through the employee door constitutes sufficient power to affect the janitors' employment conditions so as to support joint employment—is plainly wrong. If minor changes to an employee's working conditions, such as a change in which door the employees use to enter the building, were sufficient to always require a finding that a putative joint employer had the power to affect the employees' employment conditions, almost any action by a putative joint employer would weigh in favor of joint employment. But as the Second Circuit noted in Zheng, we must be "mindful of the substantial and valuable place that outsourcing, along with the subcontracting relationships that follow from outsourcing, have come to occupy in the American economy." 355 F.3d at 73. Thus, not every change in an employee's working conditions indicates joint employment.

The janitors do not establish that the trial court's finding that Fred Meyer did not have the right to hire, fire, or affect the janitors' employment condition is premised on an incorrect application of controlling law or is not supported by substantial evidence.

---

employees merely by making a complaint about the quality of service provided by the employee. Br. of Resp't at 36 (citing Jacobson v. Comcast Corp., 740 F. Supp. 2d 683, 689 (D. Md. 2010); Zampos v. W & E Commc'ns, Inc., 970 F. Supp. 2d 794, 803 (N.D. Ill. 2013); Jean-Louis v. Metro. Cable Commc'ns, Inc., 838 F. Supp. 2d 111, 118 (S.D.N.Y. 2011)).

4

The janitors next contend that the trial court erred when it found that Fred Meyer lacked knowledge of MWA violations during the class period. According to the janitors, the trial court's findings that Fred Meyer reasonably relied on contractual assurances that Expert was ensuring that janitors were paid sufficient wages up until August 2011 and that Fred Meyer subsequently reasonably relied on Expert's repeated assurances that it was monitoring its janitorial subcontractors to ensure compliance with wage laws, are premised on an incorrect interpretation of controlling law. Additionally, the janitors assert that those findings are not supported by substantial evidence because the trial court found that Fred Meyer was aware of ongoing wage violations at AAJ for a period of approximately four months at the end of 2011. We disagree.

The janitors first assert that the trial court erred when it found that Fred Meyer reasonably relied on contractual assurances that Expert monitored AAJ for compliance with wage laws through August 2011. The janitors' position appears to be that because Fred Meyer had been sued by janitors working for janitorial companies other than AAJ in the past, and it had notice of the janitors' expert witness's opinion from previous lawsuits that there was a pattern in the industry of janitors receiving legally insufficient wages, it was impermissible for Fred Meyer to rely on contractual assurances. According to the janitors, this knowledge of prior lawsuits and industry patterns was sufficient to impute to Fred Meyer any knowledge of violations that it could have obtained through diligent inquiry. To support this position, the janitors cite to a Washington case that

states that "[o]ne who has notice of facts sufficient to prompt a person of average prudence to inquire is deemed to have notice of all facts which reasonable inquiry would disclose." Enter. Timber, Inc. v. Wash. Title Ins. Co., 76 Wn.2d 479, 483, 457 P.2d 600 (1969). Thus, the janitors contend that, under Washington law, the knowledge of industry patterns and prior lawsuits was sufficient to prompt Fred Meyer to inquire into whether its subcontracted janitors were paid in compliance with wage laws, that such an inquiry would have revealed continuing violations, and therefore that knowledge of the violations can be imputed to Fred Meyer.

However, because we herein review findings of fact regarding a joint employment test imported from federal law, and the janitors do not cite to any federal cases that require imputation of knowledge to a putative joint employer, they have failed to establish that the trial court erred by not imputing knowledge to Fred Meyer.[16] In Becerra, our Supreme Court imported the "economic reality" test for joint employment directly from federal case law. 181 Wn.2d at 195-98. The Becerra court did not approve of any mutations to the federal test permitting a court to impute knowledge to a putative joint employer, and the janitors do not provide any argument to justify adopting such a mutation. Given the total absence of any argument establishing that a federal court would impute

---

[16] While the janitors cited to federal cases wherein the court imputed knowledge to an employee's direct employer, see, e.g., Reich v. Dep't of Conserv., 28 F.3d 1076, 1083-84 (11th Cir. 1994), they did not identify any federal cases where a putative joint employer was found to have knowledge of wage law violations through inquiry notice. That federal courts have imputed knowledge of violations to direct employers but have not done so for putative joint employers is telling. Indeed, it is entirely logical for Fred Meyer to have relied on Expert's assurances in the contract that it would ensure that its subcontractors complied with minimum wage laws because Fred Meyer paid for Expert's services, in part, to be able to rely on such assurances without direct management by Fred Meyer.

knowledge or any argument supporting a modification of the federal test adopted by our Supreme Court, we conclude that the trial court did not err when it declined to impute knowledge to Fred Meyer.

Next, the janitors assert that the trial court erred when it found that Fred Meyer reasonably relied on Expert's repeated written assurances subsequent to August 2011 that it was auditing its janitorial subcontractors for compliance with the MWA. According to the janitors, the trial court's finding is inconsistent with controlling law and not supported by substantial evidence because it narrowly focused on Fred Meyer's knowledge in 2012 and did not consider when Fred Meyer was subsequently notified, in 2013 and 2014, of past violations from 2012. To support its position that after-the-fact knowledge supports joint employment, the janitors cite to two Washington cases, Jumamil v. Lakeside Casino, LLC, 179 Wn. App. 665, 319 P.3d 868 (2014), and Champagne v. Thurston County, 163 Wn.2d 69, 178 P.3d 936 (2008). Neither case supports the janitors' position.

The janitors assert that Jumamil holds that there is no requirement that a putative joint employer's knowledge of wage violations be contemporaneous with the violations to support joint employment. This is not so. Jumamil considered whether a casino manager willfully withheld wages from a casino employee. 179 Wn. App. at 683-86. Whether the casino manager had knowledge of the wage withholding was pertinent to the question of whether the manager willfully withheld wages, not to the question of whether the manager was a joint employer. Jumamil, 179 Wn. App. at 685-86.

Champagne is even less on point. Therein, the court concluded that there

25

is no cause of action under the MWA when an employer has actually paid all wages due an employee. Champagne, 163 Wn.2d at 88. The employer's knowledge of violations was not even an issue in the case.

Furthermore, the record reveals that the janitors' assertion that the trial court considered only Fred Meyer's knowledge in 2012 is incorrect. The janitors point to a letter Expert sent to Fred Meyer in May 2013 and multiple communications between Fred Meyer and the United States Department of Labor in 2013 and 2014 as evidence of Fred Meyer's knowledge that was disregarded by the trial court. But the trial court clearly considered these communications because it referenced them in its memorandum decision. Just because the trial court did not agree that these communications gave Fred Meyer sufficient knowledge of violations to weigh in favor of joint employment does not mean that it disregarded the evidence. Substantial evidence in the record supports the trial court's finding that, despite these communications, Fred Meyer was not generally aware of violations. Fred Meyer was told by Expert that MHJ had, in the past, improperly paid its janitors on a salary basis, but that it had already corrected the situation. Expert assured Fred Meyer that the United States Department of Labor was investigating only the 2012 violations.[17] The

___

[17] Ultimately, Expert was incorrect about the scope of the investigation. The Department of Labor subsequently sent Fred Meyer a spreadsheet with its wage calculations in the amount it believed MHJ owed to its janitors through 2013, at which point Fred Meyer realized that there were other alleged violations of wage laws through 2013. This spreadsheet, however, included wages owed to janitors who did not work at Fred Meyer stores. The Department of Labor did not provide Fred Meyer with any details regarding other alleged violations, nor did it provide any details to identify which of the janitors it asserted were owed wages worked at Fred Meyer stores. That Fred Meyer had to ask the Department of Labor for such information in the first place, rather than simply having access to it themselves, further supports the trial court's finding that Fred Meyer did not have knowledge of the violations.

trial court clearly considered this evidence when determining whether Fred Meyer had knowledge of wage violations and whether such knowledge weighed in favor of joint employment.

Third, the janitors contend that the trial court's finding is not supported by substantial evidence because Fred Meyer knew about AAJ's wage violations from August 2011 through December 2011 due to the Becerra lawsuit. However, during that time period, Expert had already begun to take steps to address the violations committed by AAJ, including offering to pay the janitors the wages owed, and to ensure that such violations would not be repeated by other subcontractor janitorial companies. The trial court was able to consider Fred Meyer's knowledge of AAJ's violations during 2011 in the context of this evidence and other evidence pertinent to Fred Meyer's knowledge of violations during the entire class period.

The janitors' argument regarding Fred Meyer's knowledge from August 2011 to December 2011 is essentially that if Fred Meyer ever knew about any violations at any time, such knowledge requires a finding weighing in favor of joint employment regardless of circumstances. But the joint employment inquiry is not so mechanically rigid. See Becerra, 181 Wn.2d at 198. The janitors do not explain in their briefing how the knowledge Fred Meyer had regarding violations—obtained following the janitors' lawsuit against Fred Meyer in Becerra and in the context of Expert's efforts to remedy the violations—is of the type supporting a finding that Fred Meyer was a joint employer, rather than merely a customer or patron. The trial court found that this evidence did not outweigh the

evidence showing that Fred Meyer was unaware of wage violations for the majority of the class period. The janitors have not established that this was erroneous.

5

The janitors next contend that the trial court erred when it found that Fred Meyer's payments to Expert for janitorial work weighed neither in favor of, nor against, concluding that Fred Meyer was the janitors' joint employer. This is so, the janitors assert, because the trial court's finding is not supported by substantial evidence. We disagree.

According to the janitors, the trial court's finding is unsupported by substantial evidence because the trial court failed to properly account for a $1,000,000 rebate Fred Meyer demanded from Expert in May 2014.[18] Specifically, the janitors dispute the trial court's finding that the negotiated rebate did not support a finding of joint employment because Fred Meyer subsequently agreed to forgo $800,000 of the rebate in 2015. Such a finding was unsupported by substantial evidence, the janitors assert, because the contract payments between May 2014, when the rebate was negotiated, and 2015, when Fred Meyer agreed to reduce its rebate, were insufficient to allow for the payment of lawful wages. However, the janitors do not point to any evidence in the record to show that Expert actually paid any of the larger rebate amount during that time period. Instead, they assert, without citation to any supporting evidence in the record, that Expert must have paid the janitors less than a lawful wage between

---

[18] The janitors do not contend that Fred Meyer made insufficient payments to Expert prior to the negotiated rebate in May 2014.

May 2014 and the renegotiation of the rebate in 2015 and failed to pay the janitors' past due wages for earlier work *in anticipation* of having to pay the larger rebate amount.

The janitors' entirely speculative contention is not sufficient to outweigh the evidence supporting the trial court's finding that Fred Meyer did not actually receive the rebate. There is no evidence in the record to indicate that Fred Meyer received the full $1,000,000 rebate. The trial court's finding—that Fred Meyer gave up its $1,000,000 rebate—is clearly supported by the record. The janitors do not point to any evidence in the record to indicate that the amount Fred Meyer *actually paid* for Expert's services was insufficient to allow for the payment of lawful wages to Expert's subcontractors. Thus, the janitors have not established that the trial court's finding is not supported by substantial evidence.

6

Finally, the janitors contend that the trial court erred when it found that Fred Meyer's contract with Expert for janitorial services was not a subterfuge or sham designed to avoid compliance with wage laws. This is so, the janitors assert, because this finding is premised on an erroneous view of controlling law and is not supported by substantial evidence. The janitors aver that the trial court improperly considered only Fred Meyer's initial decision to outsource its janitorial work and failed to consider whether, over time, the decision to continue outsourcing janitorial work to Expert became a subterfuge designed to avoid compliance with wage laws. Again, we disagree.

The janitors' contention that the trial court did not contemplate whether Fred Meyer's decision to outsource became a subterfuge over time is directly contradicted by the record. The janitors assert that Fred Meyer had to realize at some point subsequent to its initial decision to outsource the janitorial work that its payments to Expert were such that the outsourcing model could only succeed if Expert's subcontractors were incentivized to ignore the cost of compliance with minimum wage laws. Once again, in making this argument, the janitors contend that Fred Meyer knew that Expert's subcontractors were violating minimum wage laws. But the trial court's analysis was clear that "Fred Meyer was provided assurances that Expert was hiring qualified subcontractors who understood their legal responsibilities to their employees." Thus, the janitors' assertion that the trial court failed to consider the nature of Fred Meyer's contracting relationship with Expert over time is plainly incorrect. Furthermore, as discussed in part II.C.4, the janitors have not shown that this finding is either contrary to law or not supported by substantial evidence. Therefore, the janitors have not established that the trial court's finding is premised on an erroneous view of controlling law or is not supported by substantial evidence.

### III

We conclude that the janitors have not established error in the trial court's decisions.

The janitors' entire argument on appeal is premised on the incorrect assumption that error in any of the trial court's findings of fact regarding the "things to think about" set forth in Becerra would require a remand or reversal.

As we explained in part II.B, this approach does not properly consider the "circumstances of the whole activity." Rutherford, 331 U.S. at 730. The janitors' chosen analytical method runs afoul of Judge Easterbrook's warning in Reyes that "toting up a score is not enough." 495 F.3d at 408.

Moreover, the janitors have not established that any of the trial court's findings are premised on an erroneous interpretation of controlling law, nor have they shown that any of the findings are not supported by substantial evidence. Accordingly, the janitors do not establish that they are entitled to appellate relief.

Affirmed.

WE CONCUR: